STANDARD LAND CORPORATION OF INDIANA, PINE-VAL, INC. *v.* RALPH BOGARDUS ET AL., MACKE HOMES, INC., PINE VALLEY GOLF CLUB, INC., PINE VALLEY COMMUNITY ASSOCIATION, INC.

[No. 1071A195. Filed December 4, 1972. Rehearing denied January 29, 1973. Transfer denied April 2, 1974.]

*David B. Keller,* of Fort Wayne, for appellants.

*Mentor Kraus, William F. McNagny, Barrett, Barrett & McNagny,* Fort Wayne, for appellees Bogardus, et al.; *William D. Swift,* Fort Wayne, *Phil M. McNagny, Jr., Gates, Gates & McNagny,* Columbia City, for appellee Macke; *Paul F. Nieter, John M. Whitmore, Jr.,* Fort Wayne, for appellee Pine Valley Golf Club, Inc.

LOWDERMILK, J.—This appeal comes to us from a finding and judgment adverse to the defendants-appellants, Standard Land Corporation of Indiana and Pine-Val, Inc.

The plaintiffs-appellees have brought action against appellants for declaratory judgment and for injunction and damages.

Defendants-appellee Macke Homes, Inc. filed its cross-complaint for damages.

Answers and replies were filed; pre-trial was had and orders entered.

The cause was tried by the court without the intervention of a jury, after which the trial judge, on April 30, 1971, entered his memorandum opinion of essential evidentiary facts upon which special findings of fact and conclusions of law are predicated.

The transcript in this cause is bound in six volumes, which is cited here to show the voluminous character of the pleadings and exhibits with which the trial court was confronted and from which he made his said memorandum opinion. We have studied the briefs and deduced that the trial judge has done an exemplary job of setting out essential evidentiary facts. We shall, therefore, omit a brief statement of the facts in this cause as they are most adequately set out in the trial judge's Special Findings of Fact on which he entered his Conclusions of Law and which are set out in this opinion.

The court, after rendering special findings of fact, together with conclusions of law thereon, entered judgment, all of which are as follows, to-wit:

## "SPECIAL FINDINGS OF FACT

1. Beginning in late spring or early summer of 1964, extensive negotiations were carried on between Standard Land Corporation of Indiana, (hereinafter referred to as 'Standard'), and Macke Homes, Inc. (hereinafter referred to as 'Macke'), concerning the sale by Standard to Macke of approximately 360 acres of farm land located several miles north of Fort Wayne, Indiana, and fronting on what was then U.S. Highway 27. In July 31, 1964, a letter of intent was signed by both Standard and Macke relating to such transaction. On December 4, 1964, the Defendant, Standard, as Seller, and the Defendant, Macke, as Buyer,

entered into a conditional sales contract for the sale of said land, a copy of which contract was admitted into evidence as Plaintiffs' Exhibit 1, and which is made a part of these findings of fact and incorporated herein by reference. The construction and application of numerical paragraph 5 of said contract is the pith of this lawsuit.

2. The sale between Standard and Macke involved a new land development concept for the Fort Wayne area and embodied the establishment of a planned community to be built around an eighteen hole golf course. The idea had originated with Sam Fletcher, who was then President and chief spokesman for Standard, which, by the contract of December 4, 1964, had agreed to construct and maintain the golf course in satisfactory operating condition during the term of said contract. Originally there were to be 730 lots in the addition, which number was later reduced to 642.

3. During the early negotiations between Standard and Macke, all legal matters for both parties to such negotiations were being handled by Edward J. Moppert, Jr., who was the son-in-law of Sam Fletcher, officer and director of Standard, as well as an attorney. After several months of negotiations, Macke employed Robert Haller, attorney of Fort Wayne, Indiana, to represent Macke in the final negotiations and purchase of said real estate. Haller's active representation of Macke began in late September, 1964. At that time, Macke furnished Haller with a preliminary draft of an agreement prepared by Moppert which served as the outline for later drafts. Subsequently, there were numerous meetings between Standard and Macke and their attorneys, throughout which Haller served principally as scrivener. During the negotiations about one of the provisions in said paragraph 5 of said contract which pertained to the possible future sale of the golf course by Standard to the residents in the proposed addition and members of the golf club, Fletcher stated that he wanted the residents and members to have the land comprising the golf course at its original cost. Fletcher further stated that the sum of $300.00 per lot was to be paid into an escrow fund which was to be used to pay for the club house, swimming pool, parking lot, etc. Language designed and intended to accomplish this end was embodied in controversial paragraph 5 of the contract.

4. The contract of sale as originally drafted contained a provision that Standard would not sell the golf course prior to the sale of 90% of the developed lots. On the day the contract was signed, being December 4, 1964, this

provision was deleted at the insistence of Standard and the parties thereupon agreed, understood, intended and incorporated in said paragraph 5 the provision that Standard would 'maintain or cause to be maintained the golf course in satisfactory operating condition during the term of the contract.'

5. In about March of 1965, during the development of the addition and within the purview of portions of the December 4, 1964, contract, Macke had Haller prepare another agreement for the purpose of satisfying the provision in said contract which stated, 'Buyer hereunder and the Golf Course Corporation shall enter into a written contract governing their relationship and such contract shall include operating rules for the Club, all of which shall be incorporated herein by reference.' The March, 1965, agreement, being Macke Exhibit 9, would appear to have been an attempt to satisfy said condition in said contract. The March, 1965, instrument, as well as all other instruments about which negotiations were later held, were undertaken to implement portions of the December 4, 1964, contract wherein specific reference was made to the necessity for subsequent instruments to define the rights and duties of the parties in the development venture, i.e., rhetorical paragraph 1 relating to the number of salable acres; rhetorical paragraph 5 relating to the relationship between the parties and operating rules for the country club; rhetorical paragraph 5 relating to the date by which a certain number of lots shall be purchased by Macke. There is no provision in the first, second, third and fourth grammatical sentences of rhetorical paragraph 5, which provide as follows, to-wit:

'5. *Golf Course.* As a part of the consideration for this agreement, Seller will construct or cause to be constructed, on an area graphically indicated on the plat attached, marked Exhibit "A", and made a part hereof, a regulation 18 hole golf course, which course shall be completed and ready for play on or before June 1, 1966. Seller further agrees to maintain or cause to be maintained the golf course in satisfactory operating condition during the term of this contract. Seller agrees to offer for sale to the members (prior to making any other offer to sell) by paying for the cost of land, golf course improvements only, and subject to the mortgage thereon. Buyer shall contribute Three Hundred ($300.00) Dollars from each lot sale for a membership fee which shall be used to pay for the club house, swimming pool, parking area, etc.'

for any supplemental agreements or negotiations relating to the portions of said paragraph 5 as above set forth.

Neither the March, 1965, agreement, nor the later agreement prepared by attorney Haller in August, 1965, was signed. No satisfactory explanation was given why the March, 1965, or the August, 1965, agreements were not signed, or else amended so they could be signed. This is an area of the transaction which strongly suggests that Standard intentionally wanted a certain amount of vagueness and uncertainty in the transaction so as to assure it maneuverability, and thus control, in later dealings with Macke, lot purchasers and country club members.

6. After the signing of the contract, work was begun almost immediately. Macke developed the addition, including the preparation of the home sites, putting in streets, and the laying of water lines and sewer mains. The golf course was completed by Standard by June 1, 1966. During this period both Standard and Macke worked together to make a success of the new development, and the results were remarkable. In the fall of 1965, Macke started making lot sales and Standard began receiving money from such lot sales to apply upon the purchase price under the terms of the December 4, 1964, contract. The officials of Standard were surprised as to the number and quality of the homes that were being built and the amounts that Macke was receiving from lot sales. Everything appeared to be proceeding far better than had ever been anticipated, to the mutual satisfaction and financial reward to both Macke and Standard. In August, 1966, without consultation as to ultimate cost with either Macke, the lot owners, or members of the Club, Standard started to build a club house, which was completed in December of 1967 at the approximate cost of $250,000.00.

7. Early in the development of the addition, Macke and representatives of Standard jointly prepared and made available to potential lot purchasers a brochure which is Plaintiffs' Exhibit 7 and is by reference incorporated herein. The brochure was paid for one-half by Standard and one-half by Macke and was one of the most widely used and most persuasive advertising materials employed to induce people to buy lots in the new addition. The brochure contains many representations, both written and pictorial. In essence, the potential buyer of a lot in the addition is told that upon buying a lot in the Pine Valley Country Club Addition he is moving into a planned community designed around an eighteen hole golf course; that upon the purchase

of a lot he is entitled to an initial membership in the country club; and that memberships in the country club, other than a limited number of golf memberships, are open only to Pine Valley Country Club Addition residents. The potential buyer is further told that he can 'be secure in the knowledge your investment will be protected.' Many of the buyers relied upon the representations contained in the brochure, which representations were based upon the terms of the December 4, 1964, contract, which contract was the only legal document in existence at the time of such representations which governed the respective mutual rights and duties between Standard and Macke, particularly with reference to the benefits to be conferred upon lot purchasers relating to the golf course, golf course improvements, club house, swimming pool, parking area, etc. Many press releases were issued, a substantial portion of which originated from the office of Standard. In these releases, as well as in the brochures, statements about a planned community devoted to gracious living built around an eighteen hole golf course were common and were relied upon by lot purchasers. Within a short time and certainly by the spring of 1968, it appears that, of the contracting parties, only Macke was striving to maintain the integrity of the representations made to lot owners under the terms of the contract of December 4, 1964.

8. The December 4, 1964, contract provided that Macke would contribute $300.00 from each lot sale for a membership fee for each lot owner which money was to go into an escrow account to be used to pay for the club house, swimming pool, parking area, etc. Macke paid to Standard the sum of $300.00 for each lot sold, but Standard failed to set up an escrow account as agreed. Instead, Standard used the $300.00 that it received from each lot sale for general operating expenses of Standard Land Corporation of Indiana. As of the date of trial of this cause, Macke has paid to Standard a sum in excess of $91,000.00 under this particular provision of said contract. Standard is continuing to accept from Macke the $300.00 from each lot sale and is chargeable with each of said $300.00 payments and shall account therefor pursuant to the terms of said contract and the judgment to be rendered by the Court in this proceeding.

9. Sometime in the spring of 1968, operational, administrative, and managerial control of Standard passed from its President, Sam Fletcher, to Bernard C. McGuire, representative of John Murcheson and Clint Murcheson, Texas finan-

ciers. The takeover in control of Standard was predicated upon the terms of a joint venture that was entered into in 1957 among John Murcheson, Clint Murcheson, and Sam Fletcher. The joint venture was called Pinelands of North America, for which the Murchesons put up the money, and Fletcher was to manage the joint venture until 1968. Standard, the stock of which was owned 100% by Pinelands of North America, was one of the corporations that was formed to hold and develop land that was to be purchased and developed by the joint venture.

10. When McGuire took over control for the Murchesons in the spring of 1968, he concluded, after examining the December 4, 1964, contract, that it was not a good business arrangement for the Murcheson interests. McGuire thereupon arbitrarily, unilaterally and edictally announced that the contract of December 4, 1964, was not a contract and that Standard would in no way be bound by the provisions thereof. He instructed attorney Moppert, who was preparing deeds from Standard to lot purchasers, but being paid for such preparation by Macke, to include in all future deeds a recital that the grantees in said deeds had no interest in or rights under the December 4, 1964, contract, which recital was admitted in evidence as Macke Exhibit 37, and is by reference made a part hereof. McGuire further concluded that steps should be taken immediately for Standard to divest itself of its interest in the golf course, club house, swimming pool, parking area, etc., in the Pine Valley Country Club Addition. This decision was made by McGuire without consulting Fletcher, Moppert, or any previous spokesman for Standard as to the manner in which the contract had been previously acted upon by the parties thereto. Nevertheless, after the unilateral declaration by McGuire on behalf of Standard, Standard continued to receive all benefits accruing under the December 4, 1964, contract, including the receipt of proceeds from lot sales as well as $300.00 from each lot purchaser, which $300.00 was to have gone into an escrow account, to which reference is hereinabove made.

11. McGuire immediately applied financial pressure to coerce Macke into purchasing the golf club and the improvements in order that Macke might protect previous lot purchasers and to continue the promotion of future sales of lots pursuant to the representations contained in the brochures and other media employed to advertise the attractiveness of the addition in keeping with the concept set forth in the December 4, 1964, contract. Macke was

informed that if he did not purchase the golf course and the improvements, the same would be sold to outside interests. On August 23, 1968, a contract was drawn in which Macke agreed to purchase the golf course and improvements contemplated by the contract of December 4, 1964, from Standard at a price in the area of $836,000.00. The sale of the golf course and improvements to Macke by Standard under said contract was never consummated. In this regard it is important to note, and the Court finds that a corporation formed by Standard known as Pine-Val, Inc., which was and is a Defendant and wholly owned subsidiary of Standard, was the record title owner of all the assets of the golf course except the land, however, Pine-Val, Inc. was not a party to the contract; that the contract had been cancelled by Macke in accordance with the terms thereof; that Standard could not furnish merchantable title by reason of the provisions of the contract of December 4, 1964, giving members of the first right of purchase at the expiration of the term of said contract which had not yet run on August 23, 1968; that a condition in the contract providing for a loan from John Hancock Insurance Company could not be satisfied because of title deficiencies. Although Standard has filed a cross complaint against Macke for breach of the August 23, 1968, contract, it is important to note that no attempt was ever made by Standard to prove a prima facie case, including any amount of damages claimed as a result of the purported breach.

12. Subsequent to the failure to complete the sale of the golf course and other improvements to Macke, in the early part of 1969, Standard again, with total indifference to the provisions of the December 4, 1964, contract that Standard would continue the maintenance of the golf course during the term of the contract, offered the golf course for sale to the owners of Pine Valley Country Club Addition for what Standard indicated to be a non-negotiable price of $1,028,388.00. This offer to sell was substantially higher than that which had been made to Macke and included items of expense improperly added to the cost figure, i.e., a development fee of $50,000.00 to Don Drake, an employee of Standard. The offer made no provision whatever for the substantial amount of money which should have been escrowed by Standard to have been used to pay for the club house, swimming pool, parking area, etc. Likewise, the offer made no allowance for substantial items of depreciation which had been claimed by Standard as shown by the records of Standard appended to Standard's answers

to interrogatories. A brochure, a copy of which was admitted into evidence as Plaintiffs' Exhibit 8 and is by this reference incorporated herein, contained Standard's offer to sell and was mailed to most of the residents of Pine Valley Country Club Addition during the first week of April, 1969. The brochure stated that if the golf course was not purchased according to the terms dictated by Standard it would be sold to outside interests. The brochure also contained a plan of golf course memberships which was foreign to the expressed and demonstrated intentions of Standard as well as Macke, lot owners and members to that time, and would have changed the original and basic concept of the character of the club. At the time this offer to sell was made, it was or should have been apparent to Standard that there was an insufficient number of resident lot owners to purchase the golf course at the price demanded, since considerably less than one-half of the lots had then been sold. This fact was admitted without contradiction by Standard. Further, it was apparent, even by the calculations of representatives of Standard, that the 'term of the contract' as contemplated by paragraph 5 of the contract of December 4, 1964, had not yet run, and the 'offer' contained in the brochure mailed in April, 1969, was premature.

13. The offer contained in the brochure of Standard mailed in April, 1969, was not accepted by residents, lot purchasers and members. Also in April, 1969, more precisely, April 14, 1969, Moppert, attorney for Standard, prepared and filed the incorporation papers for Pine Valley Golf Club, Inc., one of the Defendants in this action, which thereafter negotiated with Standard for several months for the purchase of the golf course and improvements at a price of $953,000.00. On October 3, 1969, Pine Valley Golf Club, Inc. entered into a conditional sales contract for the purchase of the golf course and improvements, a copy of which contract has been introduced into evidence as Defendant, Pine Valley Golf Club, Inc. Exhibit C-1, and is by reference incorporated herein. Standard paid the fees for the attorney who incorporated Pine Valley Golf Club, Inc. during the course of the negotiations for the sale of the golf course and improvements. Thereafter, the insistence on the sale of the golf course by Standard resulted in two factions in the Pine Valley Country Club Addition—those refusing to buy at the price being asked by Standard and at the time demanded by Standard, who are the Plaintiffs in this lawsuit, and those who felt they were compelled to buy the golf course regardless of price or time in order to protect their

investment and because of fear as to the future of the golf course and improvements. The latter group is mainly comprised of only a fraction of the residents of Pine Valley who are the members of the Pine Valley Golf Club, Inc., with the remaining members of the group being comprised of none-resident members, which has operated the club since the fall of 1969 with substantial financial loss and a hopeless state of insolvency.

14. At the present time, the status of the whole venture is a maze of hopeless and irreconcilable confusion. Macke has sustained losses in the course of events since 1969 due to a substantial reduction in the lot sales in the addition. A portion approximating 25% of the decrease in lot sales could be attributed to a slowdown in the economy and a general decline in market conditions. Additionally, some slackening in the rate of lot sales is attributable to difficulty encountered in obtaining sewer taps and with the sewage treatment facility. A portion of the loss to Macke in lot sales is attributable to Standard's contravention of the terms of the December 4, 1964, contract, for which Standard should respond in damages. Further, under the terms of the contract of December 4, 1964, Standard was to advance money to Macke for development purposes at the rate of 6%, which Standard has refused to do, thereby constituting a further breach of said contract by Standard, for which Standard should respond to Macke in damages. However, the proof of Macke's damages in loss or postponement of profits from lot sales, as well as from the failure of Standard to advance money for development purposes, was fraught with too much uncertainty to enable the Court to apportion such damages among the separate causes thereof, including the breach of the December 4, 1964, contract by Standard. Accordingly, the Court is unable to award compensatory damages to Macke from Standard in these areas.

15. The contract of December 4, 1964, provides that Macke shall be provided with one non-transferrable, lifetime or honorary voting membership, dues free to Elmer Macke, and that during the development of the addition, Macke shall be allowed the privilege of using the golf course facilities at no charge to it or its guests in order for Macke to promote the sale of lots in the addition. Macke and its representatives, including Elmer Macke, have been denied access to the golf course and its improvements by the actions of Standard through the conditional sale of said golf course and improvements to Pine Valley Golf Club, Inc., in further breach of the contract of December 4, 1964,

to Macke's damage in the amount of $1,750.00, being the amount Macke would have to pay to exercise the rights which were to have been accorded him without charge under the terms of the contract of December 4, 1964. The Court finds that Standard shall respond in compensatory damages to Macke in said amount of $1,750.00. The Court further finds that in addition to violating Macke's rights under said contract and thereby causing actual damages to Macke as above indicated, Standard's wrong in breaching said contract imports oppression and that such actual damages were caused by a spirit of wanton disregard of the rights of Macke, for which Standard shall respond in exemplary damages to Macke in the amount of $5,000.00.

The Court further finds that the Plaintiffs have not asked damages in their complaint nor has any evidence been introduced upon which compensatory damages could be predicated for the Plaintiffs; that Plaintiffs are not entitled to exemplary damages against the Defendants.

16. The Court further finds that:

(A) The contract dated December 4, 1964, between Standard as Seller and Macke as Buyer is a valid and enforceable contract.

(B) By the terms of said contract of December 4, 1964, as well as by facts and circumstances extrinsic to the contract, such as representations made to prospective lot purchasers concerning the golf course, club house and other improvements, and their rights thereto as members and ultimate purchasers at a time when said contract was the only legal document in existence controlling the relationships between Macke and Standard, the Plaintiffs in this action and those persons similarly situated became third party beneficiaries under the terms of said contract of December 4, 1964. Said Plaintiffs and those persons similarly situated are entitled to have the provisions of said contract enforced according to its terms for their benefit and are possessed of vested rights under said contract after having purchased lots in said addition in reliance upon representations made pursuant to said contract, in some of which representations Standard was a participant.

(C) That, pursuant to the terms of said contract, the Plaintiffs and persons similarly situated as third party beneficiaries are vested with the right to require Standard to

(a) Construct an eighteen hole golf course and to maintain or cause to be maintained such golf course in

satisfactory operating condition during the term of said contract;

(b) To offer said golf course, club house, swimming pool, and parking area to the members at the expiration of the term of the contract and prior to making any other offer for sale, at cost and subject to the mortgage thereon as contemplated in numerical paragraph 5 of said contract; and

(c) To credit each lot owner with the sum of $300.00 paid in escrow by said lot owners toward the purchase of the club house, swimming pool, and parking area.

The failure of Standard to comply with the provisions of this paragraph (C) (a), (b), and (c) constitutes a breach by Standard of the contract of December 4, 1964.

(D) That pursuant to the terms and intendment of said contract of December 4, 1964, the cost of the land on which the golf course is built shall mean the cost of such land to Standard; that pursuant to said contract cost of the golf course improvements, club house, swimming pool and parking area shall mean initial building cost to Standard less depreciation claimed or claimable as shown on the accounting records of Standard appended to answers to interrogatories which have been introduced in evidence as Plaintiffs' Exhibit 15 and is by reference incorporated as a part hereof and further less the $50,000 development fee allocated as a book entry for development fee to Don Drake, an employee of Standard; that Standard shall be permitted to add to the sale price as above computed the inventory of commodities sold, used, and dispensed in the normal and usual course of operation of the golf course, club house and swimming pool.

(E) That the maximum term of the contract, determined by mathematical calculation based on the schedule of lot purchases set forth in said contract of December 4, 1964, is nine years and one month, beginning June 1, 1966, the date on which the golf course was completed and opened for play; that Standard cannot accelerate the expiration date of the maximum term of said contract.

(F) That the parties to the contract of December 4, 1964, having accorded said contract the dignity of a valid contract by having built the golf course and maintained it for a time, having accepted the $300.00 escrow payments from lot purchasers, and having accepted all beneficial results thereof and in addition having made representations based upon said contract for the purpose of inducing pro-

spective lot purchasers to purchase lots in the addition, and, lot owners having purchased lots in said addition based specifically upon such representations, the parties to the contract, both Macke and Standard, should be estopped to deny the results of their own conduct with respect to the vested rights of innocent third parties, part of whom are Plaintiffs in this cause, and said Plaintiffs and all persons similarly situated are entitled to have Standard ordered specifically to perform the conditions of said contract, particularly the provisions of paragraph 5 of said contract.

(G) That the effort on the part of Standard, through McGuire, to sell said golf course and improvements to Macke by the contract ostensibly drawn for that purpose on August 23, 1968, constituted a breach of said contract of December 4, 1964, by Standard, and said contract of August 23, 1968, was invalid and unenforceable.

(H) That the purported sale of the golf course and improvements by Standard and Pine-Val, Inc., to certain members and some lot owners by the contract of October 3, 1969, constitutes a breach of the contract of December 4, 1964, and said contract of October 3, 1969, is to a degree collusive and such contract and the sale therein contemplated are invalid, void, and should be set aside and held for naught.

(I) That the recitals in all deeds to lot purchasers placed therein by Standard at the direction of McGuire as shown in Macke Exhibit 37 to the effect that the grantees therein had no interest in or right under the contract of December 4, 1964, are void and should be set aside and held for naught.

(J) That Standard and Pine-Val, Inc., should be restrained and enjoined from taking any action that would interfere with or cancel the initial membership of each lot owner to the golf club.

(K) That the Defendant Macke is entitled to the use of the golf course at no charge to it or its guests for the duration of the term of the December 4, 1964, contract.

(L) That the Defendant Macke is entitled to receive development loans at 6% interest from Standard.

(M) That Macke is not in default under said contract of December 4, 1964, except only as Macke's performance of certain conditions thereof have been rendered impossible because of the prior breach of said contract by Standard; that Macke is entitled to have Standard ordered to specifically perform all conditions of said contract.

(N)  That the Plaintiffs are entitled to an injunction against the Defendants, Standard, Pine-Val, Inc., and Pine Valley Golf Club, Inc., enjoining said Defendants from entering into a contract of sale of the golf course and improvements or of making any disposition of the same as would alienate the rights of the Plaintiffs herein prior to the completion of the December 4, 1964, contract.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law based upon the facts heretofore specially found, to-wit:

1.  This Court has jurisdiction both of the parties to and the subject matter of this proceeding.

2.  The law is with the Plaintiffs and against the Defendants, Standard, Pine-Val, Inc., and Pine Valley Golf Club, Inc.

3.  Standard entered into a contract with Macke on December 4, 1964, which contract is valid and enforceable and gave unnamed third parties therein described, a part of whom are Plaintiffs herein, enforceable rights upon the purchase by said third parties of lots in Pine Valley Country Club Addition in reliance upon representations based upon said contract of December 4, 1964.

4.  The Plaintiffs as third party beneficiaries pursuant to said contract of December 4, 1964, are legally entitled to certain rights thereunder, among which are:

(1)  To require Standard to maintain or cause to be maintained the golf course in satisfactory operating condition during the term of said contract;

(2)  To offer said golf course, golf course improvements, club house, swimming pool and parking area to the members at the expiration of the term of said contract and prior to making any other offer of sale at cost and subject to the mortgage thereon as contemplated in paragraph 5 of said contract;

(3)  To credit each lot owner with the sum of $300.00 paid in escrow by said lot owners toward the purchase of the club house, swimming pool, and parking area;

(4)  To have the maximum term of said contract determined to be nine years and one month beginning June 1, 1966;

(5)  To have cost of the land on which the golf course is built construed to mean the cost of the land to Standard; to have the cost of the golf course improvements, club

house, swimming pool and parking area determined to mean the initial construction cost to Standard less depreciation claimed or claimable as shown on the accounting records of Standard described in the findings herein entered; to have the $50,000.00 development fee allocated to Don Drake deducted from cost; to pay Standard the inventory value of commodities sold, used and dispensed in the normal and usual course of operation of the golf course, club house and swimming pool.

5. With respect to the contract of December 4, 1964, both Standard and Macke are estopped to deny the results of their own conduct with respect to the vested rights of the Plaintiffs and others similarly situated and the duties of both Standard and Macke to the Plaintiffs and others similarly situated which are derived from said contract based upon representations founded upon said contract upon which the Plaintiffs and other persons similarly situated reasonably relied.

6. The purported sale by Standard and Pine-Val, Inc. of the golf course and improvements to certain members and lot owners as Pine Valley Golf Club, Inc., by said contract of October 3, 1969, is invalid, void and is set aside and held for naught as constituting a breach by Standard of said contract of December 4, 1964.

7. The recitals in all deeds to lot purchasers placed therein by Standard as shown in Macke Exhibit 37 that the grantees therein had no interest in or rights under the contract of December 4, 1964, are void and are set aside and held for naught as constituting a breach by Standard of said contract of December 4, 1964.

8. The Defendant Macke is entitled to the use of the golf course at no charge to it or its guests during the term of the December 4, 1964, contract, and said Defendant Macke is entitled to receive development loans from Standard with interest at the rate of 6%.

9. Macke is entitled to recover from Standard compensatory damages in the amount of $1,750.00 and exemplary damages in the amount of $5,000.00.

10. The Plaintiffs and other persons similarly situated are entitled to an injunction against Standard, Pine-Val, Inc. and Pine Valley Golf Club, Inc., enjoining them from entering into a contract of sale of the golf course, golf course improvements, club house, swimming pool and parking area prior to the completion of the contract of December 4, 1964, and enjoining all of said named Defendants from entering

into a contract of sale of the golf course, golf course improvements, club house, swimming pool and parking area, to any other entity prior to the completion of the contract of December 4, 1964, and from taking any action which would interfere with or cancel the initial membership to which each lot owner is entitled in the golf club.

11. The effort on the part of Standard, through McGuire, to sell said golf course and improvements to Macke by the contract purportedly drawn for that purpose on August 23, 1968, constituted a breach of said contract of December 4, 1964, by Standard and said purported contract of August 23, 1968, is invalid and unenforceable.

## JUDGMENT

IT IS THEREFORE CONSIDERED, ADJUDGED, DECREED AND ORDERED:

That the Defendants, Standard Land Corporation of Indiana, Pine-Val, Inc., and Pine Valley Golf Club, Inc., are hereby restrained and enjoined from selling or entering into a contract to sell the golf course, golf course improvements, club house, swimming pool, and parking area prior to the completion of the term of the contract of December 4, 1964, and prior to making any offer to sell the same other than to the Plaintiffs and all others similarly situated, and all of said named Defendants are further restrained and enjoined from entering into a contract for sale of the golf course, golf course improvements, club house, swimming pool and parking area to any other entity prior to the completion of the term of the contract of December 4, 1964, and prior to making any offer to sell the same other than to the Plaintiffs and all others similarly situated, and from taking any action which would interfere with or cancel the initial membership to which each lot owner is entitled in Pine Valley golf club;

That the contract entered into between Standard Land Corporation of Indiana, as Seller, and Macke Homes, Inc., as Buyer, on December 4, 1964, is a valid and enforceable contract and vests Plaintiffs and all other persons similarly situated with the enforceable rights set forth in the Conclusions of Law heretofore entered in these Findings of Fact, Conclusions of Law and Judgment as third party beneficiaries of said contract of December 4, 1964, that the Defendants shall specifically perform all terms and conditions of said contract of December 4, 1964, particularly the

provisions of paragraph 5 of said contract, relating to the rights of Plaintiffs and all others similarly situated as found and determined by these Findings of Fact, Conclusions of Law and Judgment rendered thereon;

That all grantees or their successors in interest, named in deeds executed by Standard Land Corporation of Indiana for lots in Pine Valley Country Club Addition shall be vested with all rights of the Plaintiffs herein accorded and the provisions of certain deeds denying such grantees or their successors in interest, interest in or rights under the contract of December 4, 1964, are void and hereby set aside and held for naught;

That the contract of October 3, 1969, which purports to effect a sale of the golf course and improvements from Standard Land Corporation of Indiana and Pine-Val, Inc. to Pine Valley Golf Club, Inc. is void and hereby set aside and held for naught;

That the Defendants, Standard Land Corporation of Indiana, Pine-Val, Inc. and Pine Valley Golf Club, Inc. are hereby restrained and enjoined from preventing the Defendant, Macke Homes, Inc., the use of the golf course, which use shall be at no charge to it or its guests, during the term of the December 4, 1964, contract;

That the Defendant, Macke Homes, Inc., is entitled to receive development loans from Standard Land Corporation of Indiana with interest at the rate of 6%;

That the August 23, 1968, contract between Standard Land Corporation of Indiana and Macke Homes, Inc. was invalid, unenforceable and void.

IT IS FURTHER CONSIDERED, ADJUDGED, DECREED AND ORDERED:

That the Defendant, Macke Homes, Inc. have and recover of and from the Defendant Standard Land Corporation of Indiana the sum of $6,750.00 as damages sustained by Macke Homes, Inc. for the breach of the contract of December 4, 1964, by Standard Land Corporation of Indiana; that the costs of this proceeding in the amount of $—— be assessed against the Defendants, Standard Land Corporation of Indiana, Pine-Val, Inc., and Pine Valley Golf Club, Inc."

Defendants-appellants, Standard Land Corporation of Indiana and Pine-Val, Inc. timely filed their motions to correct

errors, which were overruled by the court. The said appellants in their brief set out and argued the specifications thereof, upon which they rely for reversal and we shall set out and cover in our opinion each specification that was argued in their brief. All other specifications of their said motion to correct errors have had no argument on the same and are deemed waived under Rule AP. 8.3 (A) (7).

Appellant Standard's motion to correct errors will hereinafter be referred to as "Motion." The first specification of the Motion argued is number 14, Argument A, which is that the decision is contrary to law insofar as it holds that Macke Homes, Inc. is entitled to receive development loans from Standard at the rate of 6%.

The trial court held that Macke Homes, Inc., hereinafter referred to in this opinion as "Macke," is entitled to receive development loans from Standard with interest at the rate of 6%.

The December 4, 1964, agreement, hereinafter referred to as the "Contract," did provide:

". . . Upon Buyer's request Seller shall advance to Buyer such sums as are necessary to pay for the improvement and development of the land purchased hereunder, and such advances shall bear interest at the rate of 6% until paid."

Standard contends the evidence was uncontradicted by Macke that the parties had modified the agreement so that Macke had paid 7½% interest in response to Standard's complaint, made by Mr. Fletcher, its president, that the loaning of money at 6% was unfair to Fletcher, who had to borrow it at 7½%.

We are unable to find from the record any evidence that bears out this statement that the evidence was uncontradicted. The evidence by Macke was that he did pay 7½% in response to President Fletcher's complaint, but the record does not disclose that the agreement was modified, as a consideration of the evidence clearly shows that

Macke was forced to pay 7½% to be able to get the money for the development contemplated.

Appellant Standard contends Macke had an adequate remedy at law and to support such contention relies on the case of *Wabash R. Co.* v. *Engleman* (1903), 160 Ind. 329, 332, 66 N.E. 892, 893, which case discusses the inadequacy of a legal remedy and states that such is the very foundation or indispensable prerequisite for the interposition of a court of equity, for the reason that the law has provided a complete or adequate remedy for redress at law and equity will not lie.

With this contention we cannot agree, and neither can we determine that the court's findings on the evidence and judgment thereon was contrary to law. In the case of *Cincinnati, etc. Railroad* v. *Wall* (1911) ; 48 Ind. App. 605, it is contended the complaint was insufficient and the judgment erroneous because appellee had an adequate remedy at law for damages for breach of the covenant in his deed. The court held that such was not sufficient grounds for denying the injunction,

". . . unless it also appears that the remedy at law is as full and adequate as the remedy in equity."

In *Shedd* v. *American Maize, etc. Co.* (1915), 60 Ind. App. 146, the court held that:

". . . To deny a party injunctive relief it is not sufficient to show that he has a legal remedy. If the remedy at law is not as prompt, practical, efficient and adequate, as that afforded by equity, the court may grant the injunction. . . ."

The court had said, in *Fisher* v. *Carey* (1918), 67 Ind. App. 438, 443:

". . . Where there is a legal remedy, equity will frequently grant injunctive relief to prevent a multiplicity of suits. . . ."

See, also, *Royer* v. *State, ex rel.* (1916), 63 Ind. App. 123.

Appellee Macke urges that equity prevails, as equity will prevent a multiplicity of suits which would necessarily follow

if Macke was required to borrow the development money at more than 6%, and then file suit for the difference. It is not at all difficult to see how a number of loans would be made this way and each loan would require a separate suit. Therefore, in our opinion, equity will prevail.

Argument B presents the following specifications of the Motion: 1(g) That there is no evidence that the minds of the parties to said instrument ever met upon the proposition that depreciation was to be deducted from cost in arriving at the sale price of the country club; 2(k) (i) that the court's finding of fact 16(D) is not supported by sufficient evidence (i) insofar as it states that the terms and intendment of the Contract were that the cost of land meant cost to Standard; 4(j) the court's finding of fact 16(D) is contrary to the evidence; and 10. the decision is contrary to law insofar as it holds that "cost" as used in paragraph 5 meant original cost less depreciation.

Standard and its co-appellant, Pine-Val, Inc., urge error in finding of fact 16(D), *supra*. The question here is whether the cost of the golf course, improvements, club house, et cetera, means the initial building cost to Standard less depreciation claimed or claimable, or just means the initial cost.

Macke's answers to interrogatories, as well as his evidence on the stand, is ambiguous as to this question, and the evidence of his accountant was somewhat ambiguous. In our opinion, the evidence was ambiguous to the point that the court was justified in considering the testimony relating to the intention of the parties to the Contract with regard to the term "cost" as the same was referred to in the contract between the same parties dated August 23, 1968, but never consummated. Said August 23, 1968, contract revealed that Standard was willing to sell the golf course, with all improvements, to Macke for $725,000 plus current assets, which was $12,000 less than the cost of the fixed assets minus depreciation.

It is our opinion that this was sufficient evidence upon which the trial court could find that Standard itself considered "cost" to be Standard's cost minus depreciation, and having been based on sufficient evidence, neither the finding of fact nor the conclusions of law were contrary to law.

Argument C presents the following specifications of the Motion: 2(f)(i) insofar as it states that the offer to sell land included items of expenses improperly added to the cost figure; 2(k)(iii) insofar as it states the cost does not include the development fee allocated Don Drake; 11. The decision is contrary to law insofar as it holds that "cost" as used in said paragraph 5 excluded Drake's fee as a development cost.

Appellant Standard urges that in the court's finding of fact number 12, as a part of the "cost," the court stated "a development fee of $50,000 to Don Drake, an employee of Standard" was improperly added to cost and that the finding was carried forward in conclusion of law number 4.

Standard further complains that certain finance charges were excluded from the court's definition of "cost" and all is without support in the evidence.

We have heretofore discussed and answered the objections concerning "cost" and shall not repeat them here. However, the evidence as shown by the record was that after the dispute had arisen between the parties and it was determined that Standard might be able to sell to the lot owners in the subdivision, that Don Drake, an employee of Standard, should have $50,000 for his services to his employer and that the same was going to be added onto the purchase price of the lot owners who had already, in the purchase of their respective lots, paid $300 to Standard to be used in the construction of the club house.

There is conflicting evidence as to whether Don Drake's $50,000 fee was to be considered development costs or whether this $50,000 fee was simply a part of his employment contract

with Standard. There is further evidence that in the first tendered contract of August, 1968, where Standard was going to sell to Macke, there was no mention made of any development fee to Mr. Drake.

This, in our opinion, was a conflict in the evidence which should be considered most favorably to the appellees and that the court did not err in his findings of fact or conclusions of law as to this specification of error.

Argument D—It was error to award Macke compensatory damages because of Pine Valley Golf Club, Inc.'s refusal to honor his membership—presents the following specifications of the Motion: 12. The decision is contrary to law insofar as it holds that Macke is entitled to (a) compensatory damages; (b) punitive damages; and 21(h) the court's conclusion of law number 9 is not supported by sufficient evidence, it is contrary to the evidence and is contrary to law.

Standard contends that the award of damages based on the denial of membership in Pine Valley Golf Club to Macke was error in that the denial was not made by Standard, but by Pine Valley Golf Club, Inc. Standard argues that it cannot be held liable for damages when it was not the party causing the injury.

Basically, what Standard argues is true. However, the evidence shows that Standard, by the Contract, paragraph 5, agreed to give Macke:

"The Golf Course Corporation shall furnish one non-transferable life time or honorary voting membership dues fee to Elmer Macke. During development Buyer shall be allowed the privilege of use of the golf course facilities at no charge to it or its guests in order for Buyer to promote the sale of lots."

When Standard sold the golf course to Pine Valley Golf Club, Inc., without protecting Macke's rights under the con-

tract, set out above, Standard breached this provision of the contract and is required to respond to Macke in damages for such breach. The trial court determined this damage to Macke to be $1,750, based on the evidence that the membership to which Macke was entitled over the period in dispute amounted to $1,750, based on the annual dues, which evidence, in our opinion, is sufficient for the court to make such finding and is not contrary to law.

Argument E—It was error to award punitive damages— presents the following specifications of the Motion: 12. The decision is contrary to law insofar as it holds that Macke is entitled to (a) compensatory damages; (b) punitive damages; and 21(h) the court's conclusion of law 9 is not supported by sufficient evidence; it is contrary to the evidence, and it is contrary to law.

Standard argues that punitive damages are not a proper award for breach of a business contract and cites as its authority Restatement of Contracts, § 342, as follows:

"Punitive damages are not recoverable for breach of contract."

The Indiana Annotations to § 342, omitting the citations, state:

"The restatement excludes punitive damages for breach of contract and confines them to cases of suits for torts. Of course, Indiana would allow punitive damages in such cases. * * * But the Indiana cases allow damages for breach of promise of marriage contra to the American Law Institute, but in accord with the old rule. * * * Undoubtedly, the American Law Institute's position is better."

Corbin on Contracts, writing on punitive damages, states:

"Damages are called punitive, or exemplary, when they are assessed by way of punishment to the wrongdoer and example to others, and are not measured by the pecuniary loss or injury of the plaintiff as a compensation to him. All damages are in some degree punitive and preventive,

but they are not so called unless they exceed just compensation for the harm that is actually suffered. It can be laid down as a general rule that punitive damages are not recoverable for breach of contract, although in certain classes of cases, there has been a tendency to instruct the jury that they may award damages in excess of compensation and by way of punishment. These cases, however, are cases that contain elements that enable the court to regard them as falling within the field of tort or as closely analogous thereto." 5 Corbin on Contracts (1964), § 1077, pp. 437-439.

Standard sets out in its brief the very imposing reason why punitive damages should not be imposed and that is that Macke's cross complaint did not pray for punitive damages and punitive damages first showed up in the case when they were awarded in the judgment.

Macke insists punitive damages are properly awarded in those cases where offensive conduct has been shown and for his authority relies on *Murphy Auto Sales, Inc.* v. *Coomer* (1953), 123 Ind. App. 709, 112 N.E.2d 589.

The *Murphy* case was brought for the recission of a conditional sales contract and for damages against the appellant auto sales and others, alleging fraud. The court, in *Murphy,* cites the case of *Wheatcraft* v. *Myers* (1914), 57 Ind. App. 371, 107 N.E. 81, where the court clearly stated:

". . . the rule that where malice, fraud, oppression, etc., enter into a tort, exemplary damages may be assessed, citing *Harness* v. *Steele* (1902), 159 Ind. 286, 64 N.E. 875. It seems clear that despite conflicting expressions the courts of this state have recognized punitive or exemplary damages in a proper case. Punitive or exemplary damages do not rest upon any ground of abstract or theoretical justice but upon the basis of an established public policy which seeks to promote the public safety and to punish through the medium of a civil proceeding a fraudulent wrongdoer, and *where malice, gross fraud and oppressive conduct is shown punitive damages are allowable to deter other wrongdoers from offending in a like manner.* It is true that the doctrine of punitive damages has been criticized in some states and such doctrine has been referred to as a 'heresy' or 'deformity' in the law. *Murphy* v. *Hobbs* (1884), 7 Colo.

541, 5 P. 119, 49 Am. Rep. 366. The doctrine of punitive or exemplary damages has been sparingly applied and strictly limited by the adjudicated cases in this state. However, we must recognize that this doctrine exists with a limited application in this jurisdiction." (Our emphasis.)

There is a further case of *Monarch Buick Company, Inc.* v. *Kennedy* (1965), 138 Ind. App. 1, 3, 209 N.E.2d 922. This is an action in conversion wherein the defendant-appellant was charged with tortiously converting the appellee's automobile. In the complaint appellee prayed for exemplary damages.

Our Supreme Court stated:

". . . that where '. . . malice and oppression weigh in the controversy, exemplary or vindictive damages may be assessed.' *The Louisville, New Albany and Chicago Railway Company* v. *Wolfe* (1891), 128 Ind. 347, 352-353, 27 N.E. 606. Fraud of the defendant in his actions towards the plaintiff is also an element. *Murphy Auto Sales, Inc. et al.* v. *Coomer, et al.* (1953), 123 Ind. App. 709, 112 N.E.2d 589. The general rule concerning whether exemplary damages are allowable in actions in conversion is found in 89 C.J.S., *Trover & Conversion*, § 148(b) wherein it is stated:

" 'It is proper to submit to the jury the question of exemplary damages where the facts authorize a finding of malicious or reckless and wanton conversion.' "

This court has found in one case—*Hedworth* v. *Chapman* (1963), 135 Ind. App. 129, 133, 134, 192 N.E.2d 649,—where the question of exemplary or punitive damages is considered in a contract case.

In *Hedworth*, the appellant brought an action in ejectment and the appellees filed a cross complaint seeking reformation of a real estate contract and damages. Judgment was rendered reforming the contract and granting damages and exemplary damages to the appellees, and this court affirmed the award. This cause was first submitted to a jury and a directed verdict was returned at the close of plaintiff's evidence and the jury discharged and the cause submitted to the court on Paragraphs II and III of the cross complaint. After trial by

the court, the court decreed that appellees recover $384 actual damages and $1,500 exemplary damages; that the contract agreement be reformed. This court, in passing on the matter of exemplary damages, stated:

"It is a well recognized principle that a court of equity having once acquired jurisdiction will retain it to dispose of all the questions presented by the pleadings and the evidence. Particularly this is true where the relief granted was affirmatively raised by the pleadings and was an issue before the court both upon the pleadings and the evidence. 30 C.J.S., Equity, § 67, p. 414, § 104, p. 506, § 607, p. 1002. *Stolman* v. *Boston Furniture Co.*, 120 Conn. 235, 180 A. 507.

*"The weight of authority is that exemplary damages are not generally recoverable in an action for breach of contract. In the case before us we have an action for reformation of a contract wherein the complaint alleges fraud upon the part of the appellant.*
It is apparent the trial court felt fraud had been established by the evidence when it decreed reformation of the contract and awarded exemplary damages. . . ." (Our emphasis.)

The court said further:

"It is our opinion that a court of equity may grant exemplary damages in a proper case and in doing so it is merely affording complete relief after it once has acquired jurisdiction."

It is most impressive that the *Hedworth* case is followed by *Voelkel* v. *Berry* (1966), 139 Ind. App. 267, 270, 218 N.E. 2d 924, wherein this court said:

". . . While it is true that this court recently upheld an award of punitive damages in a contract reformation action, it was stated at that time that the trial court, sitting in equity, had established fraud by the evidence and had awarded exemplary damages in conjunction with the reformation. *Hedworth* v. *Chapman* (1963), 135 Ind. App. 129, 133, 192 N.E.2d 649. One must bear in mind that in the above mentioned decision we stated that the upholding of the award required an extension of a minority holding. We feel that the rule of that case must be narrowly construed to apply only when the court sitting in equity, finds

fraud and in addition facts which positively require it in the interest of justice."

The trial court's special finding of fact number 15, as it alludes to exemplary damages, states:

". . . The Court further finds that in addition to violating Macke's rights under said contract and thereby causing actual damages to Macke as above indicated, Standard's wrong in breaching said contract imports oppression and that such actual damages were caused by a spirit of wanton disregard of the rights of Macke, for which Standard shall respond in exemplary damages to Macke in the amount of $5,000.00."

It must be noted that the special findings of fact did not find any fraud, although it did find that the contract "imports oppression" and there was a "spirit of wanton disregard of the rights of Macke." We feel we are bound by the holding of this court in *Voelkel* v. *Berry, supra,* and the trial court in the case at bar did not find fraud and did not find additional facts which positively required it in the interests of justice to grant punitive damages.

We are, therefore, of the opinion that we must narrowly construe the rule and, that having done so, the court erred in finding Macke was entitled to exemplary damages and the finding was contrary to law.

Argument F—Since the parties could not agree how long it was to be before Standard Land could sell the club, the court could not order Standard Land to wait until 1975 before selling. This argument presents the following specifications of the Motion: 2(m) the court's finding of fact 16(F) is not supported by sufficient evidence; 4 (k) the court's finding of fact 16(E) is contrary to the evidence; 9. the decision is contrary to law insofar as it hold that said paragraph 5 prevents Standard from selling the country club before June 1, 1975; 21 (c) the court's conclusion of law 4 precluding the subparagraphs thereof, is not supported by sufficient evidence; it is contrary to the evidence and it is contrary to law.

Appellant Standard urges that finding of fact 16(E), herein-above set out, was incorporated into the court's conclusion of law 4(4), hereinabove set out, that the plaintiffs are entitled "to have the maximum term of said contract determined to be nine years and one month beginning June 1, 1966." Appellant Standard further urges that said finding ignored the precept expressed in *Automobile Underwriters* v. *Camp* (1940), 217 Ind. 328, 342, 27 N.E.2d 370, 375:

"Courts are not at liberty to make contracts for individuals. They have a right to make such contracts, as in their judgment are proper."

We agree that appellant's contention as to what the law is is correct. However, in the case at bar, the court had sufficient evidence upon which to base its finding that there were provisions in the contract which could be interpreted as making a termination date for the contract.

However, there is conflicting evidence on the termination date. Mr. Macke testified that in the agreement with Standard the termination date was definitely established and that it would take a computation to figure out what it would be. The computation was based on the number of lots purchased by Macke on a definite schedule.

On the other hand, Standard presented evidence of a re-negotiation of the December 4, 1964, contract which had a definite termination date and which contract was never agreed upon.

The court, having seen the witnesses, heard the evidence, and having weighed the same, we are not now at liberty to weigh the evidence and are bound by the court's finding.

Argument G—The December, 1964, agreement is too vague and indefinite to be a contract. Too many questions were left unanswered by the agreement. By its terms it was an agreement to agree and the parties by their conduct showed they did not regard it as binding.

This argument presents specification 1 of the Motion—the decision of the court is not supported by sufficient evidence upon all necessary elements of a claim in that there was no evidence of a meeting of the minds of the parties as to the following things: (a) prior to August, 1968, that under the instrument dated December 4, 1964, terms and conditions upon which the country club was to be sold; (b) time at which the country club was to be sold; (c) no identity of the persons and/or legal entities to which title to the country club was to be transferred if and when it was sold; (d) no final plans for the club house, golf course, or other improvements which were to be built; (e) total number and/or type of improvements which were to be built as a part of the country club; (f) the meaning of the word "cost" as used in said instrument; (g) depreciation was to be deducted from cost in arriving at the sale price of the country club; and (h) there is no evidence that all or any of the plaintiffs relied upon the alleged representations.

We have heretofore answered many of the separate numbered specifications and shall not duplicate the answers in this opinion.

There is evidence that the original parties to the contract had a meeting of the minds and understood from the document itself what was expected of all parties and what all parties were to receive or expend or deliver in the execution of the contract. The contract was negotiated by an attorney who was the son-in-law of the president of Standard and after the details were substantially worked out, Standard's attorney ceased to represent appellee Macke and continued to represent Standard, and Macke brought in an attorney of his own choice. The contract was then placed in its final form and executed by the parties and was considered binding by and between them until one Mr. McGuire, representing the Murcheson brothers, in May of 1968, succeeded Mr. Fletcher as president of Standard and arbitrarily determined that the document of December 4, 1964, was not a contract.

It is the opinion of this court that although the contract was not a model, it was adequate and did constitute a valid and binding contract between the parties and the trial judge correctly interpreted the document as being a valid contract, as did the lawyers and parties prior to Mr. McGuire's determining it was not a contract.

Also, under Argument G, appellant Standard sets out the following specifications of the Motion: 3. the decision of the court is contrary to the evidence, which is a reiteration of specification 1, and the specifications therein have heretofore been discussed under specification 1 (a) through (h).

Specification 5—Standard claims the decision is contrary to law; 2(a)(i) there is no evidence that any representations were sufficiently definite and certain so as to form the basis for a contract and/or as to permit the ascertainment of the intentions and responsibilities of the parties; 19. The decision is contrary to law insofar as it holds that any representations were sufficiently definite and certain so as to form the basis for a contract and/or to permit the ascertainment of the intention and responsibility of the parties.

This is followed by a reiteration of the arguments and points set out in its Motion, which we have heretofore discussed and are not required to discuss again.

Appellant Standard supports its contention that the December 4, 1964, document was an agreement to agree and was not a contract and cites a case from the Court of Appeals for the Seventh Circuit, which considered Indiana law on the point in question as follows:

"The parties may be said to have agreed to make an agreement, but such an agreement is unenforceable in the courts. *Wallace* v. *Mertz* (1927), 86 Ind. App. 185, 191, 156 N.E. 562, Until the parties agreed on the fundamental and material items basic to the agreement, there was no enforceable contract. *Risk* v. *Thompson* (1958), 237 Ind. 642, 648, 147 N.E.2d 540." *National Tea Company* v. *Weiss* (1965), 341 F. 2d 331, 334.

In the case of *Risk* v. *Thompson* (1958), 237 Ind. 642, 648, 147 N.E.2d 540, the court said:

". . . The parties recognized the consent of Underwood as a factor in the final agreement yet to be agreed upon. The court has no right to determine whether the parties desired this consent or did not desire this consent. It was left undetermined by the parties. Parties may agree with certainty on certain parts of a contract and leave other parts or items to be completed. *Until all particulars are agreed upon there is no contract even though a court may feel such incomplete items are not important or desirable.*" (Our emphasis.)

Standard, through its new president, McGuire, selected paragraph 5 of the contract as the medium by which he would destroy the same and contended there was never any meeting of the minds, the contract was not complete, there was something to be done and that all particulars had not been agreed upon by and between the parties thereto.

This, of course, is the approach taken by Standard's counsel in its defense of this action and in its attempt to reverse the trial court.

Were this court to permit such maneuvers as were started by Mr. McGuire and Standard to influence it, equity, in our opinion, would be vilified.

In construing the original contract it was the court's obligation and duty in determining the intention of the parties to consider their intentions in the light of the surrounding circumstances which existed at the time it was made. "The court should consider the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract. . . ."

"* * *

". . . A point not covered by an express contract may be implied by the court in carrying out the intention of the

parties. *The Louisville, New Albany and Chicago Railway Company* v. *Hubbard* (1888), 116 Ind. 193, 18 N.E. 611. * * *

". . . *Omission of a term of an express contract does not void the bargain.* The parties may not give verbal expression to such important matters as the amount of payment and yet they may actually have agreed upon the amount of payment. *This agreement may be implied from the intent and actions of the parties surrounding the agreement. Corbin on Contracts,* § 29, p. 88.

"The court will be more ready to find that the apparently incomplete agreement was in fact complete and required the payment and acceptance of a reasonable wage, where the parties have already acted in reliance upon their existing expressions of agreement. The fact that the appellee continued working proves the completeness of the agreement even though there may have been no agreement as to the amount he was to be paid." (Our emphasis.) *Coleman* v. *Chapman* (1966), 139 Ind. App. 385, 391-392, 220 N.E.2d 285.

Certainly, from the record in the case at bar, the trial judge had the right to consider the contract between the parties as he did and there was evidence, in our opinion, from the actions and conduct of the parties that the trial judge could reasonably determine they had intended to be bound by the agreement.

In oral argument the appellees contended that even though there may not have been a valid contract between the parties —and argued the same in the argument sections of their respective briefs—that Standard would be estopped to deny liability on the contract and refuse to proceed further with it.

We have heretofore stated, in our opinion, there was a valid and binding contract between the parties, yet we shall answer that argument raised under the theory of estoppel.

In the case of *The Louisville, New Albany and Chicago Railway Co.* v. *Flanagan, et al.* (1887), 113 Ind. 488, 496, 14 N.E 370, the court said:

"The rule requiring the observance of good faith and fair dealing is as applicable to corporations as to individuals. Neither can involve others in onerous engagements, and,

with the consideration of the contract in their possession, disavow their acts, to the damage and discomfiture of others, unless it clearly appears that there was an absolute want of capacity to make the contract.

\* \* \*

"The plaintiffs having delivered their goods upon the defendant's line ready for transportation, they had a right to rely upon the fulfilment of the contract, in pursuance of which they acted, until it was repudiated, or until they were notified that the railway company could not, or did not intend to, transport their goods within a reasonable time. *Louisville, etc., R. W. Co.* v. *Sumner*, 106 Ind. 55 (55 Am. R. 719), and cases cited."

In the case of *Prudential Insurance Co.* v. *Bidwell* (1937), 103 Ind. App. 386, 395, 8 N.E.2d 123, the court said:

". . . 'It is generally held that if an insurer accepts a payment of a premium with knowledge that a fact exists which, by the terms of the policy, will render the contract of insurance void, the acceptance of the premium is a waiver of the right to avoid the policy for that breach.' *German, etc., Co.* v. *Yeagley, supra*, (p. 656). A distinct act of affirmance of a contract of insurance by the party entitled to avoid it, made with knowledge of the facts, and expressly such acts as the demand and receipt of premiums will constitute a waiver of the forfeiture or right to annul the contract, . . ."

28 Am. Jur. 2d Estoppel and Waiver, § 59, p. 678, states:

". . . one who knowingly accepts the benefits of a contract or conveyance is estopped to deny the validity or binding effect on him of such contract or conveyance. . . ."

In the case at bar Standard and Macke operated under the original agreement for four years to their mutual benefit. The evidence showing that this land originally was common farm land and had been well developed with an 18 hole golf course and elaborate club house erected thereon, with sewers, lights and water and paved streets, and that the sale of lots

had been far over and above the expectations and dreams of Mr. Fletcher, president of Standard.

There is further evidence from the new president, McGuire, that if Macke sells any more lots, $300 is to be paid to Standard as a membership fee to the golf course which is a benefit to Standard.

> In our opinion, there is sufficient evidence for the court to find as he did on these specifications of error and the same is not contrary to law.

Argument H—the plaintiffs are, at best, merely incidental third-party beneficiaries of any alleged contract between Macke and Standard Land and cannot bring an action for enforcement of the alleged contract—presents specification 7 of the Motion: 7. The decision is contrary to law insofar as it holds that said paragraph 5 created any enforceable rights in third parties.

Appellant Standard cites *Restatement of Contracts*, § 133, to the effect there are three classifications of third party beneficiaries; donee beneficiaries, to whom a gift is intended; creditor beneficiaries, to whom performance is directed to discharge an obligation of the promise; and incidental beneficiaries.

Standard further claims that under the facts in the present case the plaintiffs Bogardus, et al., are incidental beneficiaries of any contract made between Macke and Standard, since there was no obligation owed to the plaintiffs by either party, and no gift was intended. Standard further claims that as such incidental beneficiaries, plaintiffs cannot maintain a suit for the enforcement of the contract.

Standard relies on *Jackman Cigar Mfg. Co.* v. *John Berger & Son Co.* (1944), 114 Ind. App. 437, 52 N.E.2d 363, 366, 367:

"Whatever was the ancient law with respect to the rights of a third party to enforce a contract between others, made for his benefit, it is now the settled law of this jurisdiction that a stranger to the contract and the consideration may maintain a suit to enforce such an agreement when it

clearly appears that it was the purpose, or a purpose, of the contract to impose an obligation on one of the contracting parties in favor of such third party. It is not enough that the performance of such a contract would be beneficial to such third party. To confer upon him the right to maintain an action based upon it, it must appear that it was the intention of one of the parties to it to require performance of some part of it in favor of such third party and that the other party to the agreement intended to assume the obligations thus imposed. *Reed et al.* v. *Adams Steel & Wire Works, et al.,* 1914, 57 Ind. App. 259, 106 N.E. 882. Such an intention must clearly appear from the terms of the contract itself, *E. I. DuPont DeNemours & Company, Incorporated* v. *Ferguson,* 1927, 86 Ind. App. 429, 158 N.E. 488, and the question of the intention of the contracting parties, as distinguished from their motives, which are not controlling, should be gathered from the terms of the contract itself, considered in its entirety against the background of the circumstances known to and shown to surround the contracting parties at the time of its execution. *Woodhead Lumber Co.* v. *E. G. Niemann Investments,* 1929, 99 Cal. App. 456, 278 P. 913; *Hay* v. *Hassett,* 1916, 174 Iowa 601, 156 N.W. 734; *E. Nelson Mfg. & Lumber Co.* v. *Roddy,* Tex. Civ. App. 1930, 34 S.W.2d 624, and see *Whicker* v. *Hushaw,* 1902, 159 Ind. 1, 64 N.E. 460, and if, when so considered, the terms of the agreement evinces an intention to benefit third parties, their right to recover under it must be granted, but if inconsistent therewith, must be denied. *Fosmire* v. *National Surety Co.,* 1920, 229 N.Y. 44, 127 N.E. 472."

We have heretofore determined that the contract of December 4, 1964, was a valid and binding contract between the parties.

Under paragraph 5 thereof Macke purchased the lots in the subdivision from Standard for a specified sum. Of this amount $300 per lot was contributed by Macke to Standard for a membership fee for the purchaser of said lot from Macke.

The $300 per lot was to be held in escrow by Standard and by Standard's evidence $91,000 had been paid to Standard by Macke in compliance with the terms of the agreement.

Standard and Macke had prepared brochures in color which were most attractive, and represented that the lot purchasers would receive a membership in the country club with the purchase of the lot. The record discloses that the brochures played a great part in the sale of lots by Macke to the appellees, Bogardus, et al., as well as other purchasers, and were used extensively by Macke in sales promotion as well as by Mr. Fletcher, president of Standard.

Paragraph 5 of the contract provided, in part:

"Seller agrees to offer for sale to the members (prior to making any other offer to sell) by paying for the cost of land, golf course improvements only, and subject to the mortgage thereon. . . ."

It is the court's opinion that appellees Bogardus, et al., who are purchasers of lots from appellee Macke, are creditor beneficiaries under the contract entered into by and between Standard and Macke on December 4, 1964. The Restatement of Contracts, § 133, defines creditor beneficiaries as follows:

"(1)   Where performance of a promise in a contract will benefit a person other than the promisee, that person is, . . .

\* \* \*

"(b)   a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or right of the beneficiary against the promisee to which has been barred by the Statute of Limitations or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds. . . ."

Appellees Bogardus, et al., purchased separate lots in the Pine Valley Country Club Addition, relying upon representations made and based upon the December 4, 1964, contract as the only legal document in existence governing the relationship between Macke and Standard with respect to lot sales in the Addition; the lot purchasers exercised their right to

accept the benefits under that contract. Standard and Macke are not at liberty to engage in any course of conduct which would in any way prejudice the rights of intervening third parties after Standard and Macke had accepted benefits under the contract.

"Contracts for the benefit of third parties have been long recognized in Indiana, and a third person may sue to enforce the promise made for his benefit even though he is a stranger to the contract and the consideration therefor. *State, ex rel.*, v. *United States Fidelity, etc., Co.* (1930), 92 Ind. App. 4, 172 N.E. 656; *Jackman Cig. Mfg. Co.* v. *John Berger & Son* (1944), 114 Ind. App. 437, 52 N.E.2d 363; *Clark* v. *Corbly* (1953), 123 Ind. App. 438, 110 N.E.2d 309.

"It is a general rule that where a contract for the benefit of a third person has been accepted or acted upon, it cannot be rescinded by the parties without the consent of the third person. 13. C.J., Contracts, § 625, p. 602; 17 C.J.S., Contracts, § 390, p. 883. . . ." *Blackard* v. *Monarch's etc. Inc.* (1961), 131 Ind. App. 514, 521, 522, 169 N.E.2d 735.

This case has also been cited by an A.L.R. Annotation, 97 A.L.R. 2d 1262, at page 1270:

"[T]he principal parties to a third party creditor beneficiary contract cannot without the creditors consent rescind the contract or release one another from their obligations thereunder to the beneficiary after the creditor beneficiary has accepted the contract or changed his position in reliance thereon."

In the case at bar, appellees Bogardus, et al., and other purchasers of lots did rely on the contract, and changed their position. This is evidenced by the fact that after Mr. McGuire and the Murchesons took over and McGuire arbitrarily declared clause 5 of the Contract illegal, Macke was forced to refrain from further development, was forced to cease buying lots from Standard, as Macke could not find a purchaser for a lot in the subdivision. The trial judge so found. Having determined there was sufficient evidence upon which the trial judge could find

that appellees Bogardus, et al., were third party beneficiaries to the contract, the decision thereon is not contrary to law.

Argument I—if nothing else, the court should have modified the judgment—presents specification 25 of the Motion: The judgment should be modified to provide that Standard Land Corporation be entitled to be paid for the pro shop and maintenance building, there being no difference between those improvements and the improvements for which the judgment provides Standard is to be compensated, and it should further be modified to provide Standard shall be paid for improvements it may be necessary to construct in the future.

Appellant Standard insists there is no reason why the pro shop and maintenance building and other necessary improvements on the golf course should be treated differently from improvements for which the court held Standard was to be compensated. By its special findings of fact, the trial court did omit the pro shop and maintenance building.

Again, referring to the contract of December 4, 1964, paragraph 5, Standard and Macke did agree that Standard was to offer for sale to the members ". . . by paying for the cost of land, golf course improvements only, and subject to the mortgage thereon. . . ."

We are of the opinion that because of the questions presented and the volumes of evidence adduced at trial that the trial judge overlooked these two structures. It is our further opinion, that under the terms of the contract, those two structures are golf course improvements and pursuant to the terms of the contract should have been included and that the court erred in not including them and his failure to include them would be contrary to law.

Appellee Macke Homes, Inc. timely filed a motion to correct errors in regard to its cross complaint, for the following grounds:

"1.   The amount of recovery awarded to the Defendant, Macke Homes, Inc. by the decision of the Trial Court is inadequate.

"2.   The decision of the Trial Court is contrary to the evidence.

"3.   The decision of the Trial Court is contrary to law."

The motion is supported by a statement of the grounds showing the errors. The said motion to correct errors of Macke Homes, Inc. was by the court overruled.

Macke's specification number 1 of motion to correct errors is that the amount of recovery awarded to Macke is inadequate. This opinion is replete with the evidence as to what happened between these parties and the evidence as to why Macke could not sell any more homes was conflicting. The trial court weighed this conflicting evidence and determined that there was no way to adequately measure the damages, which was his prerogative, which leaves us with no right to weigh the evidence and we shall not attempt so to do.

Specifications 2 and 3 are that the decision is contrary to the evidence and is contrary to law and these specifications shall be treated as one.

It is only where the evidence is without conflict and that reasonable minds would be expected to come to an opposite conclusion than that reached by the trial court that it can be determined the decision is contrary to law. In the case at bar there was a conflict in the evidence to which Macke alludes in his motion to correct errors and, further, reasonable men could not all be expected to come to an opposite conclusion from that of the trial judge, and we are of the opinion that the court did not err, but was correct in his decision. *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 104 N.E.2d 669.

In this appeal, we must decide whether the special findings of fact were supported by the evidence and whether the con-

clusions of law derived therefrom were sustained by the evidence. This court must look to the evidence most favorable to the appellees where there is any conflict in the evidence. By the same token, this court must look to the evidence most favorable to the appellants under the evidence adduced under the cross complaint and cross appeal of the appellee, Macke, there being a conflict in that evidence. Chief Judge Hoffman of this court, in the case of *Chicago, Indianapolis & Louisville R. Co.* v. *Carter* (1971), 149 Ind. App. 649, 274 N.E.2d 537, quoted as follows from the case of *Palmer* v. *Decker* (1970), 253 Ind. 593, 255 N.E. 2d 797:

" 'In reviewing the evidence, on appeal, we look to the evidence most favorable to the appellee to determine if there is substantial evidence of probative value or reasonable inferences therefrom to sustain the decision of the trial court. We will reverse the decision only if the evidence and reasonable inferences are undisputed, and could only lead to a decision contrary to the one arrived at by the jury.' See also: *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 529, 104 N.E.2d 669; *Echterling* v. *Jack Gray Transport, Inc.* (1971), [148] Ind. App. [415], 267 N.E.2d 198, 24 Ind. Dec. 682; *City of Whiting* v. *Grindle* (1945), 115 Ind. App. 407, 59 N.E.2d 360."

This court cannot weigh the evidence, but can only examine the evidence to determine whether there was sufficient evidence to support the finding of the trial court. *Phar-Crest Land Corporation* v. *Therber* (1969), 251 Ind. 674, 244 N.E.2d 644; *Pontius* v. *Littleton* (1970), 146 Ind. App. 369, 255 N.E.2d 684; *Harris* v. *Second National Bank of Hamilton, Ohio* (1970), 146 Ind. App. 468, 256 N.E. 2d 594.

To determine whether the decision was contrary to law, we need only follow the guidelines set down in the case of *Pokraka* v. *Lummus Co., supra,* where our Supreme Court held as follows:

"To determine this question we will consider only the evidence most favorable to appellee, together with any reasonable inferences which may be drawn therefrom.

* * *

"It is only where the evidence is without conflict and can lead but to one conclusion, and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the ground that it is contrary to law."

This court has determined, as set out in this opinion, that the trial judge was correct in his special findings of fact and conclusions of law and his judgment duly rendered thereon, with the exception of Standard's specifications of Motion 12(b), punitive damages, and 21(h) insofar as the same pertains to punitive damages, which in the opinion are grouped under Argument E, and appellant Standard's specification 25 under Argument I and which specifications have been by the court determined to be error.

The judgment of the trial court is in all things affirmed except as to the three specifications, of which two are grouped as one, as immediately hereinabove set out.

We are authorized, under Rule AP. 15(M) to order the findings and judgment amended or corrected, as provided in Rule TR. 52(B) and are further authorized to direct final judgment to be entered or order the error corrected without a new trial unless such relief is shown to be impracticable or unfair to any of the parties or is otherwise improper.

Trial Rule 52—Findings by the Court; (B) Amendment of findings and judgment—Causes therefor, authorizes the trial court, in cases tried without a jury, or with an advisory jury, that it may, upon a judgment if one has been entered, take additional testimony, amend or make new findings of fact and enter a new judgment or any combination thereof under four separate specification.

Under Rule AP. 15(M) and Rule TR. 52(B) this court now

reverses the trial court as to specifications of error 12 (b) and 21 (h), as it pertains to punitive damages, and specification 25, and orders this cause remanded to the trial court. The trial judge is ordered and directed to amend his special finding of fact 15 by striking from the first paragraph, the last sentence thereof, in its entirety: and by striking out in his conclusion of law number 9 the words "and exemplary damages in the amount of $5,000" and correct his judgment to conform to his special findings of fact and conclusions of law thereon.

The court is further ordered and directed to amend his special finding of fact number 16 (D) to include the pro shop and maintenance building, along with the club house, swimming pool and parking area; the trial court is further directed to amend conclusion of law number 5 to include said pro shop and maintenance building and correct his judgment to conform to said special findings of fact and conclusions of law thereon.

Robertson, P.J. and Lybrook, J., concur.

NOTE.—Reported at 289 N.E.2d 803.