ATTORNEYS FOR APPELLANT
CITY OF EAST CHICAGO, INDIANA

Bruce Kotzan
James Knauer
William Bock, III
Steven Runyan
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
RIH ACQUISITIONS IN, LLC

Karl Mulvaney
Duane Denton
Kelly Eskew
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
MICHAEL PANNOS

James Richmond
Chicago, Illinois


ATTORNEYS FOR AMICUS CURIAE
STATE OF INDIANA

Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Heather Hagan
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
EAST CHICAGO SECOND CENTURY, INC.

James McNeely
Brady J. Rife
Shelbyville, Indiana

Margaret Smith
Indianapolis, Indiana

Thomas Cappas
Munster, Indiana

Michael Pannos
Merrillville, Indiana

ATTORNEYS FOR APPELLEES
TWIN CITY EDUCATION FOUNDATION,
INC. AND EAST CHICAGO COMMUNITY
DEVELOPMENT FOUNDATION, INC.

Peter Rusthoven
Deborah Pollack-Milgate
Paul Jefferson
John Boyd
Robert Grand
Mark Crandley
Indianapolis, Indiana

ATTORNEYS FOR
RESORTS EAST CHICAGO

Ronald Gifford
Scott Himsel
Indianapolis, Indiana

ATTORNEYS FOR
INDIANA GAMING COMMISSION

Norman Funk
Rori Goldman
Indianapolis, Indiana



FILED

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 49S02-0808-CV-00436

CITY OF EAST CHICAGO, INDIANA,

*Appellant (Third Party Defendant / Intervening Defendant / Third Party Plaintiff / Counterclaim Plaintiff / Cross-claim Plaintiff below),*

v.

EAST CHICAGO SECOND CENTURY, INC.,

*Appellee (Plaintiff / Counterclaim Defendant / Cross-claim Defendant below),*

RIH ACQUISITIONS IN, LLC D/B/A
RESORTS EAST CHICAGO,

*Appellee (Defendant / Third Party Plaintiff / Counterclaim Plaintiff / Cross-claim Defendant below),*

TWIN CITY EDUCATION FOUNDATION, INC., and
EAST CHICAGO COMMUNITY DEVELOPMENT
FOUNDATION, INC.,

*Appellees (Intervening Plaintiffs / Third Party Defendants / Cross-claim Defendants below),*

MICHAEL A. PANNOS, and
THOMAS S. CAPPAS,

*Appellees (Third Party Defendants below).*

———————————————————

Appeal from the Marion Superior Court, No. 49D01-0504-PL-014394
The Honorable Cale J. Bradford, Judge

———————————————————

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0608-CV-631

———————————————————

**June 30, 2009**

**Shepard, Chief Justice.**


When riverboat gambling came to Indiana and to East Chicago, the applicant for the gaming license and the City of East Chicago negotiated certain arrangements to commit part of the resulting revenue toward economic and workforce development in the City. Several private corporations were

created to facilitate those efforts. When the Indiana Gaming Commission issued a license for East Chicago, it conditioned the license on those arrangements.

On the issues joined by the City and these corporations in the present appeal (one of several appeals), we hold certain of the City's claims should survive a motion to dismiss and others should not. We also hold the existing arrangements are subject to alteration, through the appropriate administrative channels, as the Indiana Gaming Commission on advice of the City and others may deem best for the future of East Chicago's residents.

## I.   Facts and Procedural History

In 1993, Showboat Marina Partnership initiated the process of applying for a riverboat casino license for operations to be located in the City of East Chicago pursuant to Indiana's Riverboat Gambling Act. See Ind. Code § 4-33-1-1 *et seq.* (2008). Showboat entered into a local development agreement with East Chicago based on the recommendations of Mayor Robert Pastrick's Gaming Task Force. The agreement was memorialized in two letters the Mayor sent to Showboat, dated April 8, 1994, and April 18, 1995. The East Chicago Common Council ratified and endorsed both letters on September 11, 1995.

Under the arrangement, Showboat agreed to "contribute annually to and for the benefit of economic development, education and community development in the city" an amount of total contribution equal to 3.75% of its adjusted gross receipts (as defined by Ind. Code § 4-33-2-2) in the event Showboat received a license from the Indiana Gaming Commission and began operating a casino in East Chicago. Of that total contribution, 1% would be allocated directly to the City; 1% to the Twin City Education Foundation, a non-profit corporation; 1% to the East Chicago Community Foundation, another non-profit; and 0.75% to East Chicago Second Century, Inc., a for-profit corporation. The agreement also provided that Second Century would undertake development activities at sites within East Chicago, that all projects pursued by Second Century would conform to the City's development and master plans, and that all Second Century projects would require approval from the City.

The Commission issued a gaming license to Showboat on January 8, 1996, based in part on these representations, and the Commission incorporated the terms of the local agreement as conditions to Showboat's license. The gaming operation commenced in April 1997. This proved profitable for all concerned. In the intervening years through June 2006, for example, Second Century received about $16 million from the casino operation.

The casino underwent several ownership changes after the license was granted. In February 1999, the Commission approved transfer of the gaming license to Harrah's Entertainment, Inc., which continued to make the payments as required to maintain the license. In 2004, RIH Acquisitions IN, LLC, doing business as Resorts East Chicago ("Resorts"), filed an application with the Commission seeking to acquire the license from Harrah's. The Commission approved that transfer on April 21, 2005. The Commission subsequently asked the Attorney General to investigate the performance of Second Century.

## II.    History of Two Lawsuits

A few days before the Commission's 2005 hearing on transferring the license, Second Century filed an action in the Marion Superior Court, requesting a declaration that Resorts would be required to continue making payments to Second Century.

A few months later, Attorney General Steve Carter (now succeeded in office by Gregory F. Zoeller) sought to intervene, and the trial court granted the request on April 27, 2006. The Attorney General filed a counterclaim and a crossclaim, seeking imposition of a constructive trust for public benefit and an accounting for the money paid to Second Century and its principals (collectively "Second Century"). Second Century moved to dismiss the Attorney General's claims, and the trial court did so. The Attorney General appealed, and the Court of Appeals affirmed. Carter v. City of East Chicago, 881 N.E.2d 1114 (Ind. Ct. App. 2008). We granted transfer and recently reinstated the claims at issue. Zoeller v. East Chicago Second Century, Inc., 904 N.E.2d 213 (Ind. 2009).

4

The present appeal is a continuation of the original matter filed by Second Century, seeking declaration that Second Century was a third-party beneficiary of the letter agreements entitled to continue receiving funds from the riverboat operation. Resorts filed an answer, counterclaim, and third-party complaint against the two foundations and the City on April 18, 2005, requesting that the trial court declare which entity or entities should continue to receive the gambling revenues designated under the license for economic development in East Chicago. The Foundations filed their answer and intervening complaint on May 11, 2005, and the City filed its answer, third-party complaint, counterclaims, and crossclaims on June 27, 2005.

Late in 2005, Second Century and the Foundations moved to dismiss the City's claims, and the City moved for partial summary judgment. The Attorney General filed an *amicus* brief supporting the City's position that the letter agreement violated public policy.

These motions were still pending on June 8, 2006, when the Commission announced that the Attorney General had completed an investigation into the financial operations of Second Century with the assistance of Special Deputy Attorney General Patrick Baude. This inquiry concluded that much of the $16 million forwarded to Second Century could not be accounted for and could be traced to Second Century's principals. Based on financial irregularities found in that investigation, the Commission issued Resolution 2006-58, disapproving continued payments by Resorts to Second Century. Second Century then sought judicial review of the Commission's resolution in the Marion Superior Court under the Administrative Orders and Procedures Act, Ind. Code §§ 4-21.5-5.1-1 to -7-9. This review proceeding was assigned to Judge Moberly in Marion Superior Court 12. On July 20, 2006, the Foundations moved to consolidate the agency review with the civil lawsuit pending before Judge Bradford in Marion Superior Court I. The proceedings were consolidated on July 26, 2006.[1]

Judge Bradford dismissed all but one of the City's counterclaims, crossclaims, and third-party claims under the statutes of limitation. The trial court found the City's breach of contract claim actionable, however, because it "serve[d] to put Second Century on notice regarding

---

[1] The City contests the legitimacy of this consolidation. We summarily affirm the Court of Appeals disposition of the issue. Ind. Appellate Rule 58(A)(2).

5

compliance with its obligations to East Chicago under both the confirmation agreement and the letter agreements." (App. at 61.) It denied the City's motion for summary judgment.

The City appealed, and the Court of Appeals affirmed in part and reversed in part. City of East Chicago v. East Chicago Second Century, Inc., 878 N.E.2d 358 (Ind. Ct. App. 2008). We granted transfer, 878 N.E.2d 358 (Ind. 2008) (Table).

We will first turn to whether the trial court erred in dismissing the City's claims under the statutes of limitation. Then, we will consider whether the letter agreements are terminable at will. Finally, we determine whether the Foundations and Second Century are third-party beneficiaries under the agreements and the license who are entitled to receive ongoing payments from the riverboat operations.

### III.    Dismissal on Statutes of Limitation Grounds

The City contends the trial court erred in dismissing seven of its eight counts on the sole basis of the statutes of limitation. It complains that the court improperly resolved numerous factual inferences against the City, contrary to established standards governing motions to dismiss. (City's Br. at 28.)

A motion to dismiss for failure to state a claim tests the legal sufficiency of the claim, not the facts supporting it. Charter One Mortgage Corp. v. Condra, 865 N.E.2d 602 (Ind. 2007). Thus, our review of a trial court's grant or denial of a motion based on Trial Rule 12(B)(6) is *de novo*. Id. When reviewing a motion to dismiss, we view the pleadings in the light most favorable to the nonmoving party, with every reasonable inference construed in the nonmovant's favor. City of New Haven v. Reichhart, 748 N.E.2d 374 (Ind. 2001). Inasmuch as motions to dismiss are not favored by the law, they are properly granted only "when the allegations present no possible set of facts upon which the complainant can recover." Mart v. Hess, 703 N.E.2d 190, 193 (Ind. Ct. App. 1998). Put another way, a dismissal under Rule 12(B)(6) will not be affirmed "unless it is apparent that the facts

6

alleged in the challenged pleading are incapable of supporting relief under any set of circumstances." Couch v. Hamilton County, 609 N.E.2d 39, 41 (Ind. Ct. App. 1993).

Unsurprisingly, at this early stage of the proceedings, the claims, counterclaims, crossclaims, and the scores of factual allegations associated with them represent a considerable variety of claimed grounds for relief. As is frequently the case at this juncture, the facts that might support relief are not well developed. The trial court's stay of discovery makes the factual allegations less fulsome than they might otherwise be. That being said, the only way to evaluate the City's contention of error is to examine each dismissed claim individually.

**Count I.** The heart of the City's allegations in Count I, styled as "Breach of Fiduciary Duty," is:

> 78.    Pannos, Cappas and possibly others, conspired with Pastrick and aided, abetted and encouraged his breach of fiduciary duty to the City and to the public by causing funds from the East Chicago riverboat that would otherwise have been paid directly to the City to be paid to Second Century, TCEF and/or ECCF.

(App. at 386.)

Second Century and the Foundations claim that the trial court properly dismissed this count on statute of limitation grounds because the actions on which the claim of breach centers occurred well over two years before the City filed its counterclaims on June 27, 2005. (Second Century's Br. at 21-23; Foundations' Br. at 33.)

A party asserting the statute of limitation as an affirmative defense bears the burden of establishing that the action was commenced beyond that statutory period. Nichols v. Amax Coal Co., 490 N.E.2d 754 (Ind. 1986). Once the asserting party makes a *prima facie* case, the burden shifts to the non-asserting party who is then obliged to present such facts that will prevent the running of the statute. Arnold v. Dirrim, 398 N.E.2d 426 (Ind. Ct. App. 1979).

Our Court of Appeals has determined that a breach of fiduciary duty is a tort claim for injury to personal property and therefore the applicable statute of limitation is two years. Del Vecchio v.

Conseco, Inc., 788 N.E.2d 446, 451 (Ind. Ct. App. 2003); Ind. Code. § 34-11-2-4 (2008) (statute of limitation for injury to personal property). We have previously declared that a cause of action for a personal injury claim accrues and the statute of limitation begins to run when the plaintiff knew, or in the exercise of ordinary diligence could have discovered, that an injury had been sustained as a result of the tortious act of another. Malachowski v. Bank One, Indianapolis, 590 N.E.2d 559 (Ind. 1992).

Second Century contends that the language set forth in Count I undeniably refers to the activities undertaken during the administration of Mayor Pastrick when the April 8, 1994, agreement between Showboat and the City was first memorialized. Second Century further argues that the City certainly knew or should have known about the injury at that time, more than eleven years before the action containing Count I was filed. (Second Century's Br. at 23.) The City does not clearly and cognizably refute this contention in its brief or reply brief and therefore fails to bear its burden to prevent the running of the statute. It was not error to dismiss Count I on these grounds.

**Count II** is labeled "Inducement of Breach of Fiduciary Duty/Participating in Breach." It is similar to Count I and states:

> 84. Pannos, Cappas, Second Century, TCEF and ECCF have obtained benefits from the breaches of duties made in connection with the control of certain adjusted gross receipts from the East Chicago riverboat and other opportunities wrongfully obtained and disbursed and/or accumulated in violation of fiduciary duties owed to [the City] and its citizens and are therefore directly liable . . . .

(App. at 387.)

To the extent that Count II refers to the activities that transpired when the City and Showboat originally entered into the local development agreements, Second Century contends this claim accrued at that time, more than a decade before the City filed suit. (Second Century's Br. at 23.) To the extent that Count II refers to the activities that allegedly occurred during 1999, when the City and other parties entered into a Confirmation Agreement when the license transferred to Harrah's, Second Century argues that the City's claims accrued more than six years before they were filed. (Id.) Second Century further alleges that because the City was a party to the 1999 Confirmation

Agreement, it knew or should have known about the injury at the time it was executed, and therefore the latest the City could have asserted its breach of fiduciary claim was February 26, 1999. (Second Century's Br. at 23-24.)

The claim in Count II as pleaded appears fairly to cover breaches that might have occurred late in the 1990s as well as breaches that might have occurred in more recent years. Thus, while part of this claim might be barred, subject to further development of facts, it was error to dismiss Count II in its entirety.

**Count III** of the complaint alleges "Constructive Fraud/Unjust Enrichment." Second Century and the Foundations argue that the City's fraud claim is independently barred by a six-year limitation period of Ind. Code § 34-11-2-7 (2008). (Second Century's Br. at 24; Foundations' Br. at 32-33.) Second Century specifically contends that the allegations of Count III refer to the time when the 1994 agreements were executed and that the City's claim accrued at that time, over eleven years before it was filed. (Second Century's Br. at 24.)

The City responds that a court may find constructive fraud upon a finding that any of the alleged agreements at issue are void due to their "tendency . . . to violate public or private confidence, or to injure public interests," quoting Budd v. Board of Comm'rs of St. Joseph County, 216 Ind. 35, 22 N.E.2d 973 (1939), to support its contention. (City's Reply and Cross-Appellee's Br. at 37-38.)

In Budd, the parties disputed whether there was an unlawful exercise of discretion vested in the county commissioners when they awarded a public contract to a competitive bidder. Id. at 37-39, 22 N.E.2d at 975. Assessing the constructive fraud claim, we declared: "While fraud is never presumed, if the facts alleged show fraud, either actual or constructive, no positive averments of it are necessary." Id. at 39, 22 N.E.2d at 976. Here, the legally substantive paragraph within Count III states, "As set forth above, Pannos, Cappas, Second Century, TCEF and ECCF have received funds from the East Chicago riverboat under circumstances that would make the retention of the benefit unjust." (App. at 388.) This paragraph and the recitation of facts incorporated in Count III do not tend to show either actual or constructive fraud.

Moreover, none of the agreements at issue seem to rescue the City from the six-year statute of limitation. Second Century seems justified in saying that the gravamen of Count III relates to the formation of the riverboat arrangements during the 1990s. The latest was the Confirmation Agreement of February 1999, more than six years before Count III was filed. The trial court properly dismissed Count III.

**Count IV**, labeled "Breach of Fiduciary Duty," states: "The public funds, or some of them, paid to Second Century, TCEF, ECCF, Pannos and/or Cappas as described above have not been used for public purposes and/or have been spent without adequate financial controls, oversight and accountability to ensure that the funds were used for a public purpose." (App. at 389.)

Second Century argues that the City's cause of action for Count IV accrued when the City knew or should have known of the alleged deficiencies in the April 8, 1994 agreement. (Second Century's Br. at 25.) As with Count II, we conclude that this count embraced early activities that might be time-barred and later activities that likely are not. The trial court erred in dismissing Count IV in its entirety.

**Count V** is called "Accounting." It asserts that Second Century and the Foundations both owe a fiduciary duty to the City and/or its citizens of proper use and accounting for all funds received from the riverboat operation and that the corporations failed to account for the funds by producing a report or any kind of accounting reflecting income and expenses.

The Foundations assert that this claim is subject to the two-year limitation under Ind. Code § 34-11-2-4 in accordance with standard rules of discovery and accrual. (Foundations' Br. at 33.) The Foundations further argue that the City makes no precise allegation of what constituted the alleged breach and mismanagement or when precisely this unexplained conduct occurred other than the City's reference to a grand jury having subpoenaed the Foundations' records in April 2003. They say this grand jury activity put the City on notice more than two years before the City brought the claim in June 2005. (Foundations' Br. at 33.)

Second Century contends only that Count V is based upon the alleged existence and breach of a fiduciary duty owed by Second Century to the City, and as such, the Count is barred by the two-year statute of limitation. (Second Century's Br. at 25.)

The City replies that the fact that Foundation records were subpoenaed in April 2003 does not mean that the City knew about the subpoena. (City's Reply and Cross-Appellee Br. at 43.) It argues that grand jury proceedings are supposed to be secret. (Id.)

We determined long ago that "proceedings before a Grand Jury are secret." Dinning v. State, 256 Ind. 399, 269 N.E.2d 371 (1971). Hence, it is not apparent that the City had any notice, knew or should have known any details amounting to mismanagement of any funds at the time the records were subpoenaed. Whether there was in fact any actual knowledge and what that knowledge might have been is subject to further development of facts. It was error to dismiss Count V on these grounds.

**Count VI**, "Declaratory Judgment/Return of Public Funds," was asserted against Harrah's Resorts and the Foundations concerning the proper designee to be paid 2% of the adjusted gross receipts from the riverboat operation. The essence of this claim is that the City retained an inherent right to change the designee under the letter agreements, and upon transfer of the license to a licensee other than Showboat, the City was authorized to revise, renegotiate, or modify any aspect of the letter agreements. (App. at 392.) The City further alleges that it attempted to change the designee through the 2005 Economic Development Program. (Id.) It contends that any other agreement purporting to bind or restrict whom the City may select is void against public policy. (App. at 392-93.)

The Foundations argue that this claim involves matters that existed from the very execution of the letter agreements of 1994 and 1995 and that the trial court properly dismissed it under the discovery rule because it was during this period when the claim accrued. (Foundations' Br. at 32.)

The City's apparent counter is that "[i]n a case involving failure to return funds held in trust, the cause of action does not accrue *until demand is made for return of the funds or the trustee claims*

11

*an interest in the trust property*." (City's Br. at 38-39.) The City cites Emerick v. Chesrown, 90 Ind. 47, 49 (1883) (bringing a suit for return of the funds is a sufficient demand) to support its contention. (Id.) The City contends that its demand for return of funds from the Foundations and Second Century did not occur until after Mayor Pabey took office on December 29, 2004. (City's Br. at 39.)

We perceive two very different claims against the Foundations combined in Count VI. One appears aimed at ending the flow of cash to them. The other seeks return of such cash as may not have been spent in accordance with the various agreements and the terms of the Gaming Commission license.

As we indicate below, the particular arrangements for advancing economic development in East Chicago made a part of the licensing conditions by the Gaming Commission may not be terminable at the City's will, but they are not immutable. As for the request to recoup funds that may have been improperly spent, the City's allegations suffice to cover ongoing activities. While some of these might turn out to be beyond the statute of limitation, we conclude that the trial court erred by dismissing this claim outright.

**Count VII**, "Declaratory Judgment/Return of Public Funds," makes allegations against Harrah's, Resorts, and Second Century as follows:

> 119. Any provision purporting to require payment of funds from the East Chicago riverboat directly to Second Century is void to the extent it was approved as a result of a breach of fiduciary duty.
>
> . . . .
>
> 121. The city's failure to exercise the right to control and operate Second Century resulted from a breach of fiduciary duty.

(App. at 395.)

Second Century argues that Count VII was properly dismissed because the breaches of fiduciary duty occurred in 1994 under the local development agreement and in 1999 under the Confirmation Agreement, such that any claim for alleged breach accrued over six years before it was

filed. (Second Century's Br. at 25-26.) Because Count VII relates to the return of funds held in trust and not merely for a breach of fiduciary duty, Second Century did not make a *prima facie* case for a statute of limitation defense on this count.

The Foundations contend that the City "could not unilaterally delay running of limitations on its 'trust' claims by not making a formal 'demand' for funds distributed to and claimed by the Foundations from the outset." (Foundations' Br. at 34.)

Under Indiana law, a six-year limitation period applies to claims of a constructive trust. Shafer v. Lambie, 667 N.E.2d 226 (Ind. Ct. App. 1996). We determined long ago in a case involving failure to return funds held in trust, the cause of action does not accrue until demand is made for return of the funds or the trustee claims an interest in the trust property. Emerick, 90 Ind. at 49.

The City's assertion that a demand occurred only after Mayor Pabey took office on December 29, 2004, is a sufficient answer for purposes of a motion to dismiss. Accordingly, it was error to dismiss Count VII on these grounds.

**Count VIII** asserts a claim for "Reformation of Contract," arising from alleged breaches of fiduciary duty when the Economic Development Agreement, 1998 "Side Agreement" among some of the parties, and the 1999 Confirmation Agreement were entered into. (App. at 396.) Second Century argues this claim is barred by the two-year statute of limitation for breach of fiduciary duty. (Second Century's Br. at 26.) The City does not refute this in its brief. Moreover, it appears that Count VIII is substantially similar to the City's claim for constructive fraud in Count III. It was not error to dismiss this claim.

Before leaving behind the several counts which we have concluded were properly dismissed on statutes of limitation grounds, we consider the City's argument that fraudulent concealment should toll the statutes of limitation, a point it makes about most or all counts.

13

The doctrine of fraudulent concealment is available to estop a defendant from asserting the statute of limitation "when he has, either by deception or by a violation of duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action." Fager, 610 N.E.2d 246, 251 (Ind. 1993). This doctrine does not establish a new date for the running of the statute, but rather works an equitable exception. Id. "Instead of a full statutory limitation period within which to act, a plaintiff must exercise due diligence in commencing her action after the equitable grounds cease to operate as a valid basis for causing delay." Id.

As respects those counts or parts of counts which we have held above should not survive Second Century's motion to dismiss, it is very difficult to see why equity ought to estop Second Century and the Foundations from asserting the statutes of limitation. The counts centered on attacking the formation and confirmation of the original agreements seek to challenge action taken ten or fifteen years ago in full glare of the public arena. It simply asks too much to embrace the idea that these were "fraudulently concealed" from the City or anyone else.[2]

## IV.    Cross-Appeal on Count IX

The trial court determined that Count IX, labeled "Breach of Contract," is a claim subject to a ten-year limitation under Ind. Code § 34-11-2-11 (2008) and held that dismissing this claim against Second Century would be inappropriate.

On cross-appeal, Second Century argues the trial court erred on Count IX because the activities constituting the alleged breach are not prohibited, required, or otherwise addressed in the Economic Development Agreement or a subsequent Confirmation Agreement. (Second Century's Br. at 34.)

---

[2] For many of the same reasons, we think the properly dismissed counts are not rescued by the City's arguments about the equitable doctrine of adverse domination, waiver, and the doctrine of *nullum tempus occurit regi*. (See Appellant's Br. at 29-31, 34-36, 39-41.)

Count IX asserts that Pannos, Cappas, and Second Century "breached the Confirmation Agreement by failing to open its books and records to the City in order to permit the City to exercise the agreed upon oversight . . . ." (App. at 397.)

Section 2 of the Confirmation Agreement of 1999 states that Showboat "and/or any related company ("Gaming Licensee") agrees that the Gaming Licensee shall retain the obligations to fund Second Century on behalf of the City and as required by the Permanent License issued by the Indiana Gaming Commission, which funding is set at 0.75% . . . ." (App. at 1511.) Section 3 explains that the parties agree that "the City has the sole responsibility for assuring that Second Century will perform the duties described in the development agreement between the City and Showboat Marina Partnership. All projects to be constructed by Second Century are subject to the prior approval of the City and must conform to the City's comprehensive plan." (Id.)

It is difficult to see how the City could adequately determine whether Second Century was using the funds entrusted to it under the letter agreement without viewing Second Century's financial records. The trial court did not err on this count.

## V. City's Motion for Summary Judgment

The City moved for summary judgment on its request that the agreements be reformed, declared unenforceable, terminable, and void against public policy. It sought a court order redirecting the proceeds from the Foundations and Second Century to the City instead. (App. at 585.) The trial court denied the City's motion, holding that there had been no mutual mistake that might support reformation, that the agreements implied a contract to run as long as there was a license, that the agreements made Foundations and Second Century third-party beneficiaries, and that creating a permanent flow of economic development funds without stringent public oversight was not a violation of public policy.

### A. Duration of the Agreement

15

The City argues the trial court erred by holding that the contract represented by the letter agreements reflected "an implied durational term lasting as long as the river boat license." (City's Br. at 10-11, quoting App. at 58.) Even if that is true, says the City, the original license began in 1997 and expired after five years. (City's Br. at 10.) Second Century, by contrast, submits that the trial court correctly concluded that the economic development agreement reflects an implied term that is coterminous with the duration of the existence of a license to operate a boat at East Chicago and is therefore not terminable at will. (Second Century's Br. at 10.)

It is ordinary law that a contract containing no specific termination date is terminable at will and that where the parties fix no time for the performance or discharge of obligations created by the contract they are assumed to have had in mind a reasonable time. House of Crane Inc. v. H. Fendrich, Inc., 146 Ind. App. 478, 256 N.E.2d 578 (1970).

The original license was issued to Showboat effective April 15, 1997. The initial term of the license thus would have expired on April 15, 2002. See Ind. Code § 4-33-6-10(d) (2008) (five-year term for riverboat licenses). Before that date arrived, Showboat desired to transfer the license to Harrah's, and the City and various other parties entered into a series of subsequent agreements in 1998 and 1999, which effectively allowed the City to reaffirm the original agreements. (App. at 340-41.) The Commission approved the transfer to Harrah's on February 26, 1999. (App. at 341.)

In the course of the 2004-05 transactions, transferring the license from Harrah's to Resorts, the parties plainly intended to honor the same commitments contained in the letter agreements. (App. at 342.) After a hearing on April 21, 2005 (a few months after Mayor Pabey took office), the Gaming Commission unanimously approved the transfer. (App. at 343.)

The Commission's role in these events is a central one. Indiana's Riverboat Gambling Act provides: "A license to operate an excursion gaming boat: (1) is a revocable privilege granted by the state; and (2) is not a property right." Ind. Code § 4-33-6-17 (2008). The Commission may renew an existing license. Ind. Code § 4-33-4-1(a)(14) (2008). The Code also provides that any sale or transfer of a license is subject to the approval by the Gaming Commission, requires that a

16

proposed acquirer must meet the same criteria applicable to any initial applicant, and directs the Commission to adopt rules reflecting the standards applicable to transfers. Ind. Code § 4-33-6.5-12 (2008).

Moreover, the Commission has the authority to revoke or cancel the licenses and their attendant conditions. See Ind. Code § 4-33-4-1(a)(11) (2008). We agree with Second Century that even if the City could terminate the agreements at will, the City alone could not redirect gaming revenue presently flowing to the private entities by means of the ordinance it adopted in 2005, or by other means, for that matter. (See Second Century's Br. at 11.) The City does not have the authority unilaterally to terminate or alter the terms and conditions of a license issued by the Gaming Commission. Such alterations lie within the duties and powers that the Riverboat Gambling Act confers upon the Gaming Commission, which has historically acted by taking into serious account the views and arrangements of the cities in which gaming operations are conducted.

While the Foundations and Second Century are correct that the agreements imbedded in the license do not appear terminable at will, the City is correct that they are subject to periodic alteration (through the administrative processes of the Gaming Commission). As the City's motion for summary judgment sought a court order to turn over to the City all funds that Second Century and the Foundations had received and would receive from the riverboat operations, the trial court was warranted in denying the motion.

## B. Third Party Beneficiaries

The City contends that it was entitled to summary judgment on the claim by Second Century and the Foundations that they are third-party beneficiaries of the agreements and the license who possess enforceable rights to continue receiving riverboat revenue indefinitely. (See City's Br. at 13.)

To support the argument that their status as third-party beneficiaries precludes any rescission of their rights by the principal parties without consent from the Foundations and Second Century, the

17

Foundations cite Standard Land Corp. v. Bogardus, 154 Ind. App. 283, 289 N.E.2d 803 (1972). In Bogardus, the Appellate Court recited prevailing common law principles, notably for today's purpose, a declaration that "where a contract for the benefit of a third person has been accepted or acted upon, it cannot be rescinded by the parties without the consent of the third person." Id. at 323, 289 N.E.2d at 826 (citing Corpus Juris and Corpus Juris Secundum). As with many of the authorities cited in the opinion, this principle has often been deployed in commercial creditor cases. Bogardus itself was a case brought by the purchasers of lots in reliance on a promise that the vendor/developer would create a golf course community.

The earliest case law about third-party beneficiaries developed using the terminology of privity, and some of today's dialogue likewise proceeds along the lines of deciding what rights a third-party "who is not in privity" with those who made the contract may have to enforce the contract. Our decision in OEC-Diasonics, cited by East Chicago, is a representative example relying in part on this traditional formulation. OEC-Diasonics, Inc. v. Major, 674 N.E.2d 1312, 1314-15 (Ind. 1996) ("only parties to a contract or those in privity with the parties have rights under the contract"). Although this concept is still a useful starting point, it alone rarely suffices to resolve complex questions. As long ago as the Restatement of Contracts, approved in 1932, the law began to recognize that in certain situations, such beneficiaries should be entitled to rely upon and enforce the promises other parties had made to each other. See Restatement (First) of Contracts § 133. Subsequent debate has thus focused on which beneficiaries should be entitled to enforce contracts made by others and when in the course of contract activities the interests of a beneficiary become such that they should prevail over the ordinary ability of the promisor and promisee to alter or rescind their agreement, a question often styled as inquiring when the beneficiary's interest has "vested." E. Allan Farnsworth, Farnsworth on Contracts § 10.8 (2004).

The First Restatement's division of third-party beneficiaries into categories (donee, creditor, and incidental) having received only lukewarm acceptance. The Second Restatement, adopted in 1979, abandoned this structure. The present Restatement declares (1) that modification of an arrangement may be subject to a beneficiary's consent where it explicitly so provides, (2) that absent such a provision the promisor and promisee retain the power to discharge or modify their agreement without the beneficiary's consent, and, (3) that this power to discharge or modify "terminates" when

18

the beneficiary "materially changes his position in justifiable reliance on the promise." Restatement (Second) of Contracts § 311 (1979). This third concept is the one argued by the Foundations ("after a beneficiary has accepted the contract or changes its position in reliance thereon." Foundations' Br. at 18), a theme from Bogardus and its precursor, Judge Ryan's opinion in Blackard v. Monarch's Mfrs. & Distrib., Inc., 131 Ind. App. 514, 169 N.E.2d 735 (1961).

As Professor Eisenberg has pointed out in examining the implications of section 311, there is little reason why a beneficiary's reliance should do more than protect the beneficiary from the costs of his reliance. While contract law most assuredly authorizes parties to contract for the value of their expectations, Eisenberg says, a third-party beneficiary did not bargain in the first place, and thus need only be provided with reliance damages to be made whole. Melvin A. Eisenberg, Third-Party Beneficiaries, 92 Colum. L. Rev. 1358, 1419 (1992). "If a recognized beneficiary has justifiably relied on a contract," Eisenberg writes, "the importance of protecting that reliance outweighs the interests of the contracting parties, but only to the extent of the reliance." Id.

That principle appears suitable to the case before us. While the Foundations can be said to have justifiably relied on the revenue that has flowed as a result of the local development agreements and the license issued by the Gaming Commission, that reliance should not be a permanent bar to altering the methods employed to further economic development in East Chicago. As indicated above, the arrangements contained in the license issued by the Commission may be revised through resort to the Commission's administrative processes.

To the extent the City's motion sought a determination that the agreements and the license were susceptible of alteration, it was entitled to such a holding.

## VI.   Conclusion

As detailed above, the trial court is affirmed on some points and reversed on others. We remand so that there can be further proceedings on the merits.

Sullivan, Boehm, and Rucker, JJ., concur.

Dickson, J., concurring and dissenting with separate opinion.

Dickson, Justice, concurring and dissenting.

I concur in Parts I, II, IV, and V. With respect to Part III, I concur with its three introductory paragraphs, but I believe that, as to the ensuing discussions of the various Counts, the correct principles initially enunciated are not fully applied, and thus I concur in result as to the resolutions in Part III regarding Counts II, IV, V, VI, and VII, and dissent as to the resolutions regarding Counts I, III, and VIII.