**MURAT TEMPLE ASSOCIATION, INC., Appellant–Plaintiff,**

v.

**LIVE NATION WORLDWIDE, INC., and Old National Bancorp d/b/a Old National Bank, Appellees–Defendants.**

No. 49A02–1008–PL–952.

Court of Appeals of Indiana.

Aug. 16, 2011.

---

Bryce H. Bennett, Jr., Kevin N. Tharp, Riley Bennett & Egloff, LLP, Indianapolis, IN, Attorneys for Appellant.

Carl R. Pebworth, Shawna Meyer Eikenberry, Baker & Daniels, LLP, Mark J.R. Merkle, Greg A. Small, Krieg DeVault, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

GARRARD, Senior Judge.

Appellant Murat Temple Association, Inc. ("MTA"), appeals the dismissal of its complaint against Appellees Live Nation Worldwide, Inc. ("Live Nation"), and Old National Bancorp d/b/a Old National Bank ("Old National"). We affirm.

MTA owns the Murat Shrine Center ("Shrine Center") in Indianapolis. The Shrine Center consists of three interconnected buildings, known as the 1909 Murat Theatre Building, the 1922 Mosque Building, and the 1968 Murat Shrine Club Building. On September 1, 1995, MTA executed a lease ("the Lease") with Murat Centre, L.P., for the 1909 Murat Theatre Building and 1922 Mosque Building portions of the Shrine Center ("the Leased Premises"). Live Nation is a successor in interest to Murat Centre, L.P., under the Lease.

In January 2010, MTA learned that Live Nation was planning to sell naming rights to part or all of the Shrine Center. On January 28, 2010, MTA delivered a letter to Live Nation stating that MTA's approval was required for any name change of the Leased Premises. On March 16, 2010, Live Nation announced that it had entered into a naming rights agreement with Old National. On that same day, MTA sent a letter to Live Nation and Old National objecting to any name change to the Leased Premises and asserting that Live Nation lacked the right to rename the Leased Premises. Nevertheless, Live Nation placed a marquee on the 1922 Mosque

Building bearing the name "Old National Centre." Appellant's App. p. 15.

Subsequently, MTA filed a complaint against Live Nation and Old National. MTA accused Live Nation of breach of contract and conversion. MTA accused Old National of conversion, tortious interference with a contractual relationship, and tortious interference with a business relationship.

Live Nation and Old National each filed motions to dismiss MTA's complaint. Following a hearing, the trial court granted both motions to dismiss. This appeal followed.

MTA raises five claims, which we consolidate and restate as:

I.   Whether the trial court erred by dismissing MTA's claim against Live Nation for breach of contract.

II.  Whether the trial court erred by dismissing MTA's claim against Live Nation and Old National for conversion.

III. Whether the trial court erred by dismissing MTA's claims against Old National for tortious interference with a contractual relationship and tortious interference with a business relationship.

## I.   STANDARD OF REVIEW

Indiana Trial Rule 12(B)(6) authorizes dismissal of a complaint for failure to state a claim upon which relief can be granted. A motion to dismiss for failure to state a claim tests the legal· sufficiency of the claim, not the facts supporting it. *City of East Chi., Ind. v. East Chi. Second Century, Inc.*, 908 N.E.2d 611, 617 (Ind.2009). Thus, our review of a trial court's grant or denial of a motion based on Trial Rule 12(B)(6) is de novo. *Id.* When reviewing a motion to dismiss, we view the pleadings in the light most favorable to the nonmoving party, with every reasonable inference construed in the nonmovant's favor. *Id.* Motions to dismiss are not favored by law, and they are properly granted only when the allegations present no possible set of facts upon which the complainant can recover. *Id.*

During the hearing on Live Nation and Old National's motions to dismiss, MTA tendered two exhibits to the trial court. When a trial court considers a motion to dismiss for failure to state a claim upon which relief can be granted, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Ind. Trial Rule 12(B). In this case, the trial court allowed MTA to submit the exhibits but stated, "I'm not going to hear any evidence on them." Tr. p. 25. Furthermore, in its final judgment the trial court noted that it had considered the pleadings and the parties' arguments but did not refer to the exhibits. On appeal, none of the parties assert that this is an appeal from a grant of summary judgment. Under these circumstances, we conclude that the trial court did not consider MTA's exhibits and we will apply our standard of review for motions to dismiss. *Cf. Ace Foster Care and Pediatric Home Nursing Agency Corp. v. Ind. Family & Soc. Servs. Admin.*, 865 N.E.2d 677, 681–82 (Ind.Ct. App.2007) (reviewing the grant of a motion to dismiss as a grant of summary judgment where the trial court's order expressly stated that it had reviewed supplemental documents submitted by the parties). We shall also disregard the exhibits that MTA submitted at the trial court hearing.

## II.   BREACH OF CONTRACT

The elements of a breach of contract action are the existence of a contract,

the defendant's breach thereof, and damages. *Niezer v. Todd Realty, Inc.,* 913 N.E.2d 211, 215 (Ind.Ct.App.2009), *trans. denied.* Here, none of the parties dispute the Lease's validity. Furthermore, neither Live Nation nor Old National contended in their motions to dismiss that, if Live Nation breached the contract, MTA failed to suffer damages from the breach. Therefore, our analysis focuses on the element of whether a breach occurred.

■■■ The issue of breach must be resolved by reference to the terms of the Lease. Indiana courts have recognized the contractual nature of leases and the applicability of the law of contracts to leases. *Stewart v. TT Commercial One, LLC,* 911 N.E.2d 51, 55 (Ind.Ct.App.2009), *trans. denied.* The construction of a contract presents a question of law and is reviewed de novo. *Id.* We read the contract as a whole and construe the language so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* at 56. Where the terms of a contract are clear and unambiguous, we will not construe the contract or look at extrinsic evidence, but will apply the contractual provisions. *Village Commons, LLC v. Marion Cnty. Prosecutor's Office,* 882 N.E.2d 210, 215 (Ind.Ct.App.2008), *trans. denied.*

In its complaint, MTA asserted that Live Nation's sale of naming rights without MTA's consent breached the Lease. In response, Live Nation contends that the Lease authorizes Live Nation to sell naming rights as to the Leased Premises.

Section 1.01 of the Lease defines the Leased Premises, and Live Nation's rights to the Leased Premises, as follows:

Lessor hereby leases to Lessee and Lessee hereby leases from Lessor, upon and subject to the terms, conditions, covenants, and provisions hereof: (a) the 1909 Theatre Real Estate and the 1922 Mosque Real Estate (as such terms are defined below); (b) all appurtenances, rights, privileges, interests, tenements, hereditaments and easements in any way now or hereafter belonging, appertaining or relating to the 1909 Theatre Real Estate and/or the 1922 Mosque Real Estate or derived therefrom, including, without limitation, all right, title, and interest of Lessor in and to any land lying in the bed of any adjacent street, road or highway; (c) any and all rights, title and interests that Lessor may now or hereafter have in and to the 1909 Theatre Building, the 1922 Mosque Building and the Improvements; . . . .

Appellant's App. p. 27.

MTA asserts that the right to publicly name a building is among the rights "enjoyed by the owner of the building." Appellant's Br. p. 10. Pursuant to Section 1.01, MTA leased to Live Nation "any and all rights, title and interests" that MTA had to the 1909 Theatre Building and the 1922 Mosque Building. That clause, although broad, is not ambiguous. Consequently, we apply the plain language of the Lease to the facts, and we conclude that MTA's power to publicly name the Leased Premises is among the rights that MTA leased to Live Nation.

■■■ MTA argues that in the absence of a provision explicitly granting Live Nation the power to rename the Leased Premises, a reading of the Lease that allows Live Nation to sell naming rights to a third party is, in essence, based on an implied covenant in fact. We disagree. Unless otherwise agreed to or specifically reserved, everything which belongs to the demised premises in a lease or is used with and is appurtenant to the premises, and which is reasonably necessary to their beneficial use and enjoyment, will be considered as incident to the premises. *Caito v. Indianapolis Produce Terminal,* 162 Ind.

App. 590, 597, 320 N.E.2d 821, 825 (Ind.Ct. App.1974). Section 1.01 explicitly grants Live Nation "any and all rights" MTA may have as to the 1909 Theatre Building and the 1922 Mosque Building. The Lease employs clear and unambiguous language. There is no need to imply a covenant in fact in this case. *See Keystone Square Shopping Ctr. Co. v. Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 423 (Ind.Ct.App. 1984) (refusing to imply a covenant in the parties' lease requiring the tenant to operate a specific business on the site because the "parties were capable of including such a provision in the express language of the contract and failed to do so").

Our reading of Section 1.01 is supported by Section 3.02 of the Lease. That clause provides, "[t]he Lessee shall retain the phrase 'Murat Theatre' in the name of the theatre in the 1909 Theatre Building." Appellant's App. p. 34. As MTA notes, this clause applies only to the "theatre business within the Leased Premises," not the entire Leased Premises. Appellant's Br. p. 17. Thus, Section 1.01 provides a broad grant of authority to Live Nation, including naming rights, and the parties negotiated only one limitation on naming rights, in Section 3.02. Presumably, if MTA had intended to further restrict Live Nation's authority to rename all or part of the Leased Premises, the parties would have added additional limitations.

MTA maintains that by placing a new marquee on the building bearing the name "Old National Centre" and by using the name "Old National Centre" in advertising, Live Nation has effectively and inappropriately renamed the entire Shrine Center, rather than just the Leased Premises. We view the facts in the light most favorable to the MTA and construe all inferences in MTA's favor, but the facts do not support a conclusion that Live Nation has renamed the entire Shrine Center. Article XII of the Lease provides, in relevant part:

> Lessee and its assignees and sublessees shall each have the right to install, maintain, and replace in and upon any part of the Leased Premises, such signs and advertising matter as Lessee or any of its assignees or sublessees may desire; provided that any and all such signs shall comply with all applicable present and future laws, ordinances, requirements, orders, rules and regulations of all governmental authorities having jurisdiction.... Lessee and its assignees and sublessees shall each have the right to remove all existing signs and advertising matter located on or in the Leased Premises.

Appellant's App. p. 43. According to the plain language of the Lease, Live Nation was authorized to place "signs and advertising matter" "upon any part of the Leased Premises," so the installation of the marquee on the Mosque Building is in keeping with the authority MTA granted Live Nation in the Lease. Subject to the limitation set forth in Section 3.02, nothing in the Lease otherwise limits Live Nation's authority with respect to signage or mandates that Live Nation use a certain name when advertising events at the Leased Premises. The public may perceive the Shrine Center differently due to the installation of the marquee and Live Nation's use of the Old National Centre name in advertising, but regardless of the public's perception, we conclude that Live Nation has not exceeded the scope of its rights under the lease.[1]

---

1. In support of its claim, MTA cites to the exhibits it introduced at the hearing on Live Nation and Old National's motions to dismiss. As we have already noted, we will not consider these exhibits.

MTA further argues that the Lease cannot be read to grant Live Nation the right to sell public naming rights for the Leased Premises because MTA retains the sole right to use certain parts of the Leased Premises. Specifically, MTA retains an "exclusive right and easement to use the Basement Area, Shrine Museum, Office Area, Train Room and Kniepe Room and the non-exclusive right and easement to use the Common Maintenance Shop at all times during the Term...." Appellant's App. p. 63. All of these named areas and rooms are located in the Leased Premises. MTA argues that it did not intend to give away naming rights to portions of the Leased Premises that Live Nation does not control. We disagree with MTA's reading of the Lease. MTA granted Live Nation broad naming and signage authority over the Leased Premises in Section 1.01 and Article XII of the Lease, subject to the one restriction set forth in Section 3.02, which applies to the Murat Theatre room. There are no other provisions in the Lease barring Live Nation from renaming other portions of the Leased Premises. Even if the Lease could be construed to bar Live Nation from renaming the individual rooms and areas over which MTA retains exclusive rights of access and use, MTA did not allege in the complaint that Live Nation has sought to rename any of these rooms or areas on an individual basis.

The plain language of the Lease grants Live Nation the authority to sell naming rights to the Leased Premises and to post appropriate signs and advertising. Based on our application of the Lease to the facts as stated in MTA's complaint, we conclude that there are no possible set of facts upon which MTA can recover against Live Nation for breach of contract. Therefore, the trial court did not err by dismissing MTA's claim.

## III. CONVERSION

Indiana Code section 35–43–4–3 (2005) defines criminal conversion as knowingly or intentionally exerting unauthorized control over the property of another person. Pursuant to Indiana Code section 34–24–3–1 (1998), a person who suffers a pecuniary loss as a result of a violation of Indiana Code section 35–43–4–3 may bring a civil action against the person who caused the loss. Unlike in a criminal trial, a claimant in a civil action need prove by only a preponderance of the evidence that the defendant committed the criminal act; a criminal conviction of conversion is not a condition precedent to recovery in the civil action. *French–Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166 (Ind.Ct.App.2008). In any conversion action, criminal intent is an essential element that must be proven. *Id.* at 1166–1167. It is this mens rea requirement that differentiates conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not intended to cover. *Id.* at 1167.

In this case, MTA alleged in its complaint that Live Nation and Old National both knew that MTA had objected to their negotiations and had told them that Live Nation had no authority to sell naming rights for the Shrine Center in whole or in part. MTA further alleged that despite their knowledge of MTA's objection, Live Nation and Old National intentionally and knowingly executed a naming rights agreement, thereby exerting unauthorized control over MTA's right to publicly name the Shrine Center. However, as we established above, the Lease authorizes Live Nation to rename the Leased Premises. Therefore, MTA's conversion claim fails because neither Live Nation nor Old National exerted unauthorized control over MTA's property. The trial court did not

err by dismissing that portion of MTA's complaint. *See Dean V. Kruse Found., Inc. v. Gates,* 932 N.E.2d 763, 769 (Ind.Ct. App.2010) (determining that a purchaser's claim against a seller for conversion based on the seller's retention of earnest money from their transaction was without merit because the seller was contractually entitled to keep the money).

## IV. TORTIOUS INTERFERENCE

█ In its complaint, MTA sued Old National for tortious interference with a contractual relationship and tortious interference with a business relationship. The basis for both claims is that Old National interfered with the relationship between MTA and Live Nation. We have consistently held that an action for intentional interference with a business relationship arises where there is no contract underlying the relationship. *Levee v. Beeching,* 729 N.E.2d 215, 220 (Ind.Ct.App.2000). Here, MTA and Live Nation's relationship is governed by the Lease, and MTA has alleged tortious interference with a contract. For these reasons, we affirm the trial court's dismissal of MTA's claim of tortious interference with a business relationship and consider only MTA's claim of tortious interference with a contractual relationship.

█ To state a claim for tortious interference with contract, a plaintiff must allege 1) the existence of a valid and enforceable contract, 2) the defendant's knowledge of the existence of the contract, 3) the defendant's intentional inducement of breach of the contract, 4) the absence of justification, and 5) damages resulting from the defendant's wrongful inducement of the breach. *Morgan Asset Holding Corp. v. CoBank, ACB,* 736 N.E.2d 1268, 1272 (Ind.Ct.App.2000).

MTA alleged that Old National induced Live Nation to breach the Lease by entering into a naming rights agreement despite MTA's warning to Live Nation and Old National that MTA retained the authority to publicly name the Shrine Center. However, we have already determined that Live Nation did not breach the Lease by entering into a naming rights agreement with Old National. Consequently, MTA's claim for tortious interference with a contractual relationship must fail, and the trial court did not err by dismissing this claim. *See Gatto v. St. Richard Sch., Inc.,* 774 N.E.2d 914, 922 (Ind.Ct.App.2002) (determining that the plaintiff's claim for tortious interference with a contractual relationship could not succeed because the plaintiff had failed to establish the existence of a breach of contract).

For the reasons stated above, we affirm the trial court's dismissal of MTA's complaint.

Affirmed.

BAKER, J., and NAJAM, J., concur.